**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00287-CV**
_____

**MICHELE DIBASSIE, Appellant**

**V.**

**DAMON DIBASSIE, Appellee**

**On Appeal from the 418th District Court**
**Montgomery County, Texas**
**Trial Cause No. 19-01-00879-CV**

**MEMORANDUM OPINION**

This is an appeal from a final decree of divorce. Appellant Michele DiBassie contends the trial court abused its discretion in making a disproportionate division of property in favor of appellee Damon DiBassie. Michele argues the trial court erred by awarding Damon property and assets that belonged to Structural Concrete Systems, LLC ("SCS"), a separate legal entity; crediting her with the value of real property that had been gifted to their daughter; and entering a judgment against her. Michele also argues the trial court erred by relying on findings of fact that are based

on insufficient evidence and not supported by the record. We affirm the trial court's judgment.

BACKGROUND

Michele and Damon married in 1993 and started SCS in 2001. In 2019, Damon sued Michele seeking a divorce. In his Petition, Damon claimed the marriage had become insupportable due to discord or a conflict in personalities that destroyed the legitimate ends of their marriage. In his Second Amended Petition for Divorce, Damon added SCS as a Co-Respondent,[1] and he requested that the trial court divide the marital estate in a just and right manner. Damon also requested that the trial court award him a disproportionate share of the parties' estate for the following reasons: fault in the breakup of the marriage; benefits the innocent spouse may have derived from the continuation of the marriage; disparity of earning power of the spouses and their ability to support themselves; community indebtedness and liabilities; tax consequences of the division of property; business opportunities of the spouses; need for future support; nature of the property in the division; wasting of community assets; reimbursement; attorney's fees to be paid; and actual and constructive fraud committed by Michele.

Damon further alleged that both he and Michele have separate estates and requested the trial court to confirm his separate property and reimburse his separate

---

[1]Structural Concrete Systems, LLC is not a party to this appeal.

2

estate for funds or assets expended by his separate estate for the benefit of Michele's separate estate. Damon requested that the trial court reimburse the community estate for funds and or assets expended by the community estate for payment of unsecured liabilities of Michele's separate estate and for the value of community time, toil, talent, and effort expended by Michele to benefit or enhance her separate estate. Damon alleged that SCS was the alter ego of Michele and acted solely as a conduit for the performance of Michele and her business. Damon explained that he owned 49% of SCS and Michele owned 51%, and SCS holds both his and Michele's property either on deposit, in safekeeping, in safe deposit boxes, or in a trust or fiduciary capacity.

In his Third Amended Petition, Damon alleged Michele was guilty of committing constructive fraud and breaching the fiduciary duty she owed him during their marriage. Damon also alleged that Michele wasted, spent, and/or disposed of his share of the community property without his knowledge or consent, and she misused and misapplied community property, money, and assets. Damon requested the trial court to calculate the value by which the community estate was depleted as a result of Michele's fraud, calculate and determine the amount of the reconstituted estate, divide the value of the reconstituted estate between the parties in a manner the trial court deemed just and right, and grant legal and equitable relief to accomplish a just and right division, including a money judgment against Michele.

3

Damon also requested relief from Michele as the majority shareholder of SCS and claimed Michele tortiously interfered with his relations with SCS and improperly withdrew him as a member of SCS and from SCS's bank accounts. Damon explained that Michele's actions terminated his reasonable expectation to continue his business relationship with Michele and SCS and caused him damages. Damon alleged that Michele committed fraud on the community and breached her fiduciary duty by attempting to withdraw him as a member of SCS, and if the trial court found his withdrawal was valid, Damon argued that Michele committed breach of contract by failing to pay him a distribution as required by SCS's Regulations. Damon requested attorney's fees and an accounting and appraisal of SCS's fair market value. Damon also alleged a claim for conversion, pled that the restraints in the alleged Employment Agreement and SCS's Regulations violated the Texas Business and Commerce Code and were unenforceable, and sought actual and exemplary damages.

Damon filed a First Supplemental Petition to Petitioner's Third Amended Petition for Divorce alleging that Michele misappropriated funds by purchasing a home in Galveston ("Galveston Home") with community funds and putting the title in their daughter's name. Damon asked the trial court to impress a constructive trust on the Galveston Home and award it to him. Damon filed a Fourth Amended Petition for Divorce, alleging, among other things, that because he never signed or agreed to

4

SCS's Regulations, the Regulations do not bind him or govern SCS or Michele's attempt to withdraw him from SCS. Damon also requested declaratory relief, including declarations that SCS's Regulations, the 2018 document withdrawing him from SCS, and the Employment, Noncompetition, and Confidentiality Agreement were invalid.

Michele filed a Third Amended Counter-Petition for Divorce and alleged that Damon committed fraud on the community estate, breached his fiduciary duty, and wasted community property. Michele asked the trial court to award her a disproportionate share of the community estate, reconstitute the community estate, confirm her separate property, award her a money judgment for damages on her independent tort claims, and award her attorney's fees, expenses, and costs. In response, Damon filed a Revised Fourth Amended Petition for Divorce to address Michele's new claims.

During the pendency of the divorce, Michele filed for bankruptcy, and the divorce proceeding was removed to United States Bankruptcy Court for the Southern District of Texas and then remanded back to the state court for the disposition on its merits. In its Order Granting Damon's Motion for Abstention and Remand, the bankruptcy court found that forum shopping was an issue in Michele's bankruptcy case because the removal of a property division incident to a divorce to a Federal Bankruptcy Court is not a normal or typical occurrence. After the divorce proceeding

was remanded back to state court, the trial court conducted a bench trial. The issues contested in the appeal hinge largely on whether the final judgment represents a fair division of the parties' marital estate. We discuss the testimony of the witnesses relevant to the parties' arguments raised in their appellate briefs.

Michele testified she and Damon were married in 1993 and have one adult daughter who resides in Galveston. They ceased to live together in November 2018. Michele explained that in December 2001, she and Damon started SCS, a commercial construction company engaged in concrete repair organized as a limited liability company, with a principal place of business in Houston, Texas, and they were the only managing members. Prior to working for SCS, Michele worked for her family business, as a legal secretary in the concrete industry, and as a database manager. Michele testified that she completed some college but does not have a degree or any licenses or certificates.

Michele testified that Daniel Hoffman, an accountant and attorney, drafted SCS's Regulations in 2002. Michele testified that she had Damon's consent to cut and paste a copy of his electronic signature on the Regulations. Michele explained that the Regulations provided that, unless otherwise agreed by unanimous decision of all members, a member could be withdrawn from SCS upon filing a voluntary bankruptcy petition, dying, being adjudicated incompetent, filing a dissolution of a certificate by a corporation, distributing an estate's entire interest in the company,

or upon the affirmative vote of a majority of the remaining members. Michele agreed that the Regulations did not provide for the withdrawal of a member based on a criminal conviction. Michele also explained that upon withdrawal, the member is entitled to a distribution of the fair market value of the member's interest to be determined by an agreement of the members or by an appraiser if the members cannot agree. Michele testified that the Regulations Hoffman prepared did not contain any noncompete, non-solicitation, or confidentiality clauses.

Michele testified about a second set of regulations that also contained electronic signatures and included (1) an additional withdrawal provision, providing for withdrawal upon the occurrence of being adjudicated guilty of any criminal offense and (2) a different determination of the fair market value of the member's interest being based upon actual assets of the company. Michele did not know why there were two signed versions of the regulations and claimed that she did not add the provision or know who had done so. Michele agreed that in 2009, she had included Hoffman's original version of SCS's Regulations with an application for woman business entity owned status with the city of Austin.

Michele also testified about the Employment Noncompetition and Confidentiality Agreement, which was dated December 2001. Michele testified the agreement was created in 2010 and backdated to SCS's date of inception because of an appeal with the City of Houston concerning SCS's entity status. Michele

7

explained that she received the form for the agreement from an unknown attorney, modified the form to include SCS and Damon, and cut and pasted Damon's electronic signature on the agreement with his permission. Michele testified that in addition to other things, the noncompetition agreement prohibited Damon from competing with SCS. When asked what consideration Damon received for signing the agreement, Michele explained that SCS's certification was granted, but she later testified that in addition to Damon's member interest in SCS, he received a $60,000 yearly salary as consideration, which was to be paid at the end of every month that SCS had a positive cash flow. Michele testified that the agreement also contained a provision that an employee may be terminated for having a conviction of or entering a plea of nolo contendere to a charge of a felony or misdemeanor involving moral turpitude. Michele agreed that prior to 2010, the year Michele testified the agreement was created, Damon had been convicted of driving while intoxicated.

Michele explained that after Damon was in jail in September and October of 2018, he returned to work in November and left SCS on December 1, 2018. Michele testified that she withdrew Damon from being a member of SCS in December 2018, because he tried to withdraw money from SCS's bank account, shut down SCS's online profile, and cancelled her business debit card. Michele explained that the Withdrawal was signed on January 7, 2019, but she backdated the date on the Withdrawal to be effective the day he left SCS. Michele testified that between

8

December 1, 2018 and January 7, 2019 she moved money out of SCS's account so Damon could not withdraw any money. Michele explained that she used the criminal provision in the second set of regulations to withdraw Damon as a member. Michele also explained that between December 1 and January 7, she did not inform Damon she had withdrawn him as a member of SCS, and she did not pay Damon for the value of his interest in SCS as specified by the Regulations. Michele testified that they attended mediation and agreed to have SCS valued by Jeannie McClure, and Michele provided the financial statements, tax returns, and general ledger.

Michele testified that on June 19, 2019, her accountant rendered SCS's financial statements for the period ending December 31, 2018, and she assumed McClure had the financial statement to perform her valuation but admitted that McClure may not have had the document because her original valuation was performed on June 30, 2019. Michele testified that the 2018 financial statements show the members' equity was $2,469,486, and a member's bonus of $928,866 was taken to receive a tax reduction. After paying taxes on the bonus, she redeposited the money into SCS's account. Michele explained it was "just an accounting action[,]" and she never discussed it with Damon, and at the end of 2018, it appeared that she and Damon had taken $1,154,586 in distributions. Michele also explained that SCS's statements of cash flow shows SCS had $2,117,505 in investment account receivables in three Merrill Lynch accounts and that there was a decrease of

9

$1,833,078, but she was not sure where that number came from. Michele testified that she provided information to the accountant showing that going into 2019, SCS had a backlog of $1,000,000 and estimated revenues of $2,017,604 from additional contracts to be performed in January 2019. Michele explained that she never presented financial statements that were materially misleading. Michele testified that SCS's 2018 tax return shows it had $3.2 million in ordinary business income, which differs from SCS's 2018 financial statements.

Regarding SCS's financial statement dated June 30, 2019, Michele agreed that the accountant included a statement that "'[m]anagement has elected to omit substantially all the Disclosures and statements of cash flows required by accounting principles generally accepted in the United States of America.'" Michele testified that she did not understand what that statement meant and claims she did not omit anything. Michele explained that the June 30 balance sheet was based on the period of December 31, 2018 through June 30, 2019, which was after Damon took a $1,000,000 distribution from his Merrill Lynch account, and the balance sheet showed $2,290,565 in member equity and $1,080,372 in the investment accounts. Michele did not know why the member equity on December 31, 2018, which was $2,469,000, had only decreased to $2,290,565 as of June 30, 2019, despite Damon having taken his $1,000,000 distribution. Michele testified she guessed Damon received the partial distribution of $956,711; however, she did not know who

10

received the $514,686 member distribution without looking at the supporting documents, but she claimed she took distributions to pay Damon's bills. Michele explained that Damon's $1,000,000 was pledged to SCS, and after he took his distribution, SCS's balance sheet showed that amount as a loss, which affected SCS's bonding capacity.

Michele also testified about SCS's financial statement for December 31, 2019, which had not been finalized as of August 2020, because they were still working on the numbers concerning the property and equipment on the balance sheet. Michele explained she had never really worried about the balance sheet's accuracy, but they needed to perform inventories to get an accurate number for the bonding company. Michele testified that she had produced SCS's general ledger as of December 31, 2019, in a pdf format. Michele explained that the general ledger shows she received a paycheck on December 28, 2018 for $318,342, but she claimed it went into petty cash and back into her member's contribution account to pay wages. Michele did not know why the ledger showed her member's capital contribution account received an uncashed paycheck marked petty cash for $532,789.63 on that same date. Michele explained that the capital contribution was not split between her and Damon's capital accounts because it "wasn't a real paycheck. It was just in order to get over the threshold for the tax deduction." Michele also explained that on December 3, 2018, she moved $275,700 from SCS to the DiBassie Leasing account so Damon would

11

not deplete the account. Michele testified that she did not know why the funds she transferred to DiBassie Leasing flowed through Damon's member capital account, but she claimed it was perhaps to pay for the Bobcat. Michele testified that Damon's Merrill Lynch member account was solely in his name and she had a similar account in her name that contained $1,056,384.53 as of December 31, 2018, and both accounts were set up when they started their divorce proceeding. Michele explained that in 2019, $2,274,452 in total distributions went out, and Damon only received the $1,000,000 distribution when he left SCS. Michele testified that the other distributions are not entirely hers, and she takes out $27,000 per month for payroll.

Michele further testified that she filed for bankruptcy in May 2020, and in her bankruptcy schedule she claimed the Richards property that she and Damon owned was valued at $800,000, but the land only appraised for $150,000. Michele testified that she listed herself as the 100% owner of SCS because she believed she had paid Damon for his 49% interest when he took his $1,000,000 distribution that was listed as an asset on SCS's balance sheet. Michele explained that she listed SCS's value as $457,000, which was the cash in the company, excluded any accounts receivables, and added the value of all the equipment and assets that were in their personal names to their community property. Michele also omitted other assets, including their wine collection, gun safe, and fifth wheel. Michele further testified that they paid

$90,312.50 for their Houston Oaks membership to celebrate Damon's birthday, and she used distributions from SCS to pay for bills from Houston Oaks.

In July 2019, Michele used proceeds from her individual Merrill Lynch account to purchase their daughter a home for $279,361, and she testified that she did not discuss the purchase with Damon when she made it. Michele explained that she also transferred money from her individual Merrill Lynch account to SCS's checking account to pay business expenses, and she transferred money out of SCS's checking account into her personal account to pay her personal expenses. Michele testified that in 2019, she spent approximately $60,000 traveling to France, Spain, and Africa, and she gave money to a relative. Michele also testified that between January 2019 and June 2020 she "possibly" spent $137,319.19 on travel expenses. In 2020, Michele paid $60,000 cash for her daughter's car using money from SCS, and Damon agreed to the purchase. In her bankruptcy filings, Michele disclosed that in 2019, she received $415,129 in distribution from SCS, which included the money to purchase her daughter's home. Michele's inventory included her valuations for their community property, and she valued SCS at $1.39 million, which included the prefab building valued at $130,238.

Michele explained that she sought to remove the divorce proceeding and protective orders to bankruptcy court, but the bankruptcy court granted Damon's motions to dismiss her bankruptcy and remanded the cases back to state court.

13

Michele agreed that the bankruptcy court found that forum shopping was an issue in her case, but she claimed she filed bankruptcy because of attorney's fees. Michele testified that she was still in bankruptcy because the court vacated its dismissal order, but Damon had filed another motion to dismiss. Michele explained that she paid her divorce attorney with her salary from SCS and member distributions.

Michele testified that their home on Imperial Oak ("the Imperial Oak property") sits on two lots totaling four acres, and SCS is located in a trailer or prefab office on their property behind the home. Michele explained they owned a total of ten acres, which included adjacent land known as the Country Pines property. Michele testified that the Imperial Oaks property appraised for $555,000, and the Country Pines property appraised for $158,000. Michele testified that on December 1, Damon came to the Imperial Oak property and removed property from SCS. Michele explained that Damon took, among other things, the Kubota UTV, lawn mower, Kubota lawn tractor, his truck, and tools. Michele explained that the Kubota tractor was in Damon's name as well as all the vehicles SCS uses, and she did not know if the Kubota UTV was in Damon's name. Michele also testified that she purchased the Cashel Glen property two years prior to marrying Damon, and during the marriage, she made approximately $70,000 in payments on the property, which was paid off two years prior to trial.

Michele explained that she had pled cruelty in the divorce due to suffering physical, mental, and sexual abuse by Damon. Michele further explained that Damon's alcohol and drug problems created a volatile marriage and affected SCS's business. Michele also testified that Damon cheated on her in 2017 and 2018.

Damon testified that he did not approve or consent to Michele's spending, including her buying their daughter a new car. Damon testified that his inventory shows the value of his estate. Damon further testified that his proposed division of property valued the Richards property at $190,000, which included the $75,000 steel structure that had been erected since he had valued the property at the appraised value of $130,000 on his inventory. Damon explained that he paid $52,000 for his fifth wheel trailer that is three years old. Damon requested that the trial court award him the Imperial Oaks property, the Richards property, and the Country Pines property. Damon also testified he did not approve the purchase of the Galveston home, and he asked the court to either impose a constructive trust on the home or consider it as part of his waste claim. Damon explained that he was concerned about the trial court awarding him a personal judgment against Michele because she could discharge it in her bankruptcy, and he requested that any judgment be against SCS.

Damon testified he noticed several issues when he reviewed SCS's 2019 general ledger that Michele provided. Damon explained that fraudulent costs had been added to at least seven jobs to make it appear that the profits were lower and to

15

devalue the company. Damon had requested the native form of SCS's Quickbooks to reconcile the jobs, but Michele filed bankruptcy and the trial court halted its proceeding. Damon testified that he was also unable to depose Chris Reeves, one of SCS's managers, about excessive bonuses and cash Michele gave him in 2019. Damon testified that he believed Michele fraudulently filed bankruptcy after spending excessively and that he had to pay approximately $75,000 in attorney's fees to have his divorce case remanded back to state court.

Damon explained that he alleged a breach of contract claim against Michele for using false documents to withdraw him from SCS and for failing to pay him for his portion of SCS. Damon testified that he did not receive any money from SCS in 2019 or 2020, but he had $968,815.88 in January 2019, $560,000 in January 2020, and had spent nearly $1,000,000 in twenty months. Damon explained that since he filed for divorce, he had spent, among other amounts, over $33,000 in travel, $8,000 in liquor stores, $20,000 on his girlfriend's eye surgery, $45,000 on a tractor, several hundred thousand dollars on improvements to the Richards property, accounting expenses on his new business, and he bought a Harley Davidson. Damon testified that he also sold an airplane.

Damon testified that in 2019, Michele took $1,600,000 in distributions from SCS plus her salary and cash she wasted, and in 2020, she spent more than $500,000. Damon explained that Michele spent approximately $315,000 on the Galveston

16

home and over $130,000 in travel expenses from January 2019 to June 2020 for her and their daughter. Damon also explained that Michele failed to cooperate with the litigation and discovery requests and filed bankruptcy, and her behavior hindered the process, caused him to incur excess attorney's fees, and resulted in Michele wastefully spending money on attorney's fees. Damon testified that SCS's June 2020 financials show approximately $2,900,000 of backlogs of contracts, but Michele failed to provide documentation of that amount.

Damon explained that he has a Bachelor of Science in psychology with a minor in history, and he went to school to be a general contractor. Damon also explained that his work history includes forensic investigations and knowledge of structural repair for concrete structures. Damon testified that he provided the industry knowledge to perform SCS's work and shared his knowledge with SCS's employees. Damon further testified that when he filed for divorce he alleged cruel treatment because Michele told him she had all the books and records, she would ruin him, and make sure he never worked again.

Damon explained that in 2017, he got his third DWI, pled guilty in August 2018, and served sixty days in county jail. Damon testified that he was working for SCS in 2018, and he did not receive actual notice about his removal until he went to Chase bank to get statements for the divorce. Damon further testified that he never transferred money out of the Chase account. Damon explained that he never signed

SCS's Regulations or gave Michele approval to use his signature on the Regulations that would allow his removal for a criminal charge or conviction. Damon testified that he found two sets of regulations on his computer's hard drive, and the 2018 version contained the criminal kick-out language, but the 2001 or 2002 version did not. Damon also explained that he never saw, signed, or authorized Michele to sign a document that would prevent him from competing or soliciting business or clients, and he never received a $60,000 salary from SCS as compensation for signing the alleged noncompete agreement. Damon testified that the noncompete employment agreement indicates it was created in 2001, but it contains the Imperial Oaks property's address, which they acquired in 2008. Damon further testified that he gave the computer hard drive to Aaron Hughes, a forensic computer specialist.

Damon requested a disproportionate share of the community estate because Michele caused him to incur increased attorney's fees and she committed fraud by alleging that he signed "some document, kicking me out [sic] my own company and taking over the bank accounts and spending money the way she has." Damon explained the whole process has been hindered and his attorney never got SCS's true Quickbook records. Damon testified that there has been a disparity in earning power because in 2019 and 2020 he had no income. Damon explained that he created Technical Structural Repair Group, LLC ("TSR") and is waiting until the divorce is finalized to start conducting business, but he needs money to reestablish himself.

18

Damon explained that he had lost his earning capacity due to the alleged noncompete agreement and because Michele had badmouthed him in the industry. Damon requested that the court impose a judgment against SCS to equalize the division of the money he is owed for the value of SCS. Damon also testified that he is unable to pay his attorney's fees, which exceed $450,000. Damon explained that he made multiple attempts to mediate and settle the case. Damon testified that Michele breached her fiduciary duty to him as a member of SCS by copying and pasting his name on documents, spending excessively, purchasing their daughter a home without his knowledge, and failing to provide discovery and turn over SCS's Quickbooks in native form.

McClure, a CPA who specializes in business valuation and certified forensics, testified that she was jointly appointed as a business valuation expert to assess the fair market value of SCS. McClure testified that she prepared her original report on June 30, 2019 and a supplemental report, which contains her most recent valuation, on December 31, 2019. McClure concluded that SCS's fair market equity value was $1,390,000 as of December 31, 2019. McClure testified that Michele's commitment of working capital was approximately $1,080,000 on June 30, 2019, $440,000 on December 31, 2019, and "just south of $40,000[]" on June 30, 2020. McClure explained that working capital is an important element of her valuation, and the reduction was not a withdrawal of funds from SCS but a withdrawal from Michele's

personal brokerage account. McClure also explained that having the December 31, 2019 financials could have made a difference in her report.

Robert Vega, the manager of a computer technology store, testified that his staff copied the hard drive of the computer Damon took from the marital home. Aaron Hughes, a forensic analyst of electronic devices, testified that he was provided sample copies of SCS's original Regulations, the altered regulations, and an external hard drive and was asked to identify various versions of the sample documents on the hard drive. Hughes testified that SCS's original Regulations were created on January 4, 2002 and did not contain the criminal kick-out, noncompete, or the non-solicitation language. Hughes explained that the altered document containing the criminal kick-out, noncompete, and non-solicitation language was created on August 30, 2018, and stored in a folder titled "divorce[.]"

James Hamon, a certified real estate appraiser, testified that he appraised the Imperial Oaks property, the Country Pines property, and the Richards property. Hamon testified that the value of the Country Pines property is $158,000, excluding the mobile home and storage containers. Hamon testified that the value of the Imperial Oaks property is $555,000, which included all improvements fixated on the property. Hamon explained that the workshop on the Imperial Oaks property was assessed at $20,000.

20

John Baggett testified that he met Damon and Michele at the Houston Oaks country club, had known them for approximately three years, and traveled with them to Italy twice. Baggett explained that Damon did not have a reputation of being a belligerent, abusive drunk, but was a "social drinker, like anybody else." Baggett also explained that he never saw Damon get violent or upset or hear about him having bad behavior at Houston Oaks. Baggett testified that he lives at Houston Oaks, and he was upset about Damon being removed from the club. Baggett further testified that on one occasion he witnessed Michele being verbally abusive and shouting very loudly with expletives at an unknown man. Steve Winter, another member of Houston Oaks, testified that he knew Michele and Damon from the club and had traveled with them. Winter explained that he never saw Damon be a belligerent drunk, act unruly at the club, or be abusive.

The trial court granted the parties a divorce based on the grounds of insupportability. The trial court awarded Damon the following property: Imperial Oaks home and property excluding the shop, the Richards property; Country Pines lot excluding mobile home and containers; Merrill Lynch account ending in 450; Merrill Lynch account ending in 551; Chase account for TRS ending in 0066; Chase account for TRS ending in 2903; Merrill Lynch SEP account ending in 284; ownership of the limited liability company known as TSR and all assets and debts of TSR; 2018 GMC Denali; 2018 Ram 3500; 2015 Harley Davidson; 2011 Kubota

UTV; 2018 fifth wheel; 2018 Kubota lawnmower; 2019 John Deer Tractor; Kubota M-56 with equipment; prefab office trailer; 2019 Harley Davidson; golf cart at Richards property; 2011 Club car golf cart; Kubota M1489; proceeds from the airplane sale; jewelry and personal effects in his possession; gun safe and guns; personal property in his possession; one half or copies of all pictures; J.J. Watt helmet; tools; pressure washer; car accessories, motorcycle gear and equipment; military stuff; nail puller; weighs and weight bench equipment; scuba diving gear; tanks and helmets; his college books; clothes and suits; and his U of H ring, diamond ring, and any other jewelry belonging to him in Michele's possession. The trial court ordered Damon to pay the debt associated with his awarded property, one-half of the parties' 2019 IRS tax liability, and the following debts: American Express account ending in 3006; American Express account ending in 2004; Capital One account ending in 2069 or 2096; Chase account ending in 3909; Chase account ending in 4862; American Express account ending in 2005; and American Express account in the name of TSR ending in 3003.

The trial court awarded Michele the following property: any interest the community estate may have in the Galveston home; Chase account ending in 0140; Merrill Lynch account ending in 367; Chase account ending in 8250; the business known as SCS; all assets and debts of that business; Merrill Lynch SEP account ending in 283; 2014 Tesla; any interest the community estate has in daughter's car;

22

golf cart at Galveston home; two Arabian horses; 2017 Toro lawn tractor; 2004 Alumacraft boat, trailer, and motor; 2005 Premier pontoon boat, trailer, and motor; all wine in her possession that was previously in the cellar of Houston Oaks; her jewelry and personal effects in her possession; the Houston Oaks membership; and any personal property in her possession not awarded to Damon. The trial court ordered Michele to pay the debt on the American Express account ending in 4004 and a $300,000 judgment with interest to Damon to equalize the division of the marital estate and found the division of the marital estate to be just and fair. The trial court also confirmed the Cashel Glen property as Michele's separate property. The trial court stated, "I'm not awarding the assets and debts of the business. I'm awarding the ownership of the business to wife."

Damon filed a Motion for Clarification on the Trial Court's Ruling, seeking among other things, whether the prefab office building the trial court awarded to him was the same mobile home awarded to Michele and whether the trial court awarded either party to pay their attorney's fees. Michele filed a response to Damon's motion, arguing, among other things, that certain property the trial court awarded Damon belonged to SCS and should have been awarded to her. The Final Decree of Divorce incorporated the trial court's oral pronouncement and ordered Michele to pay one-half of the parties' 2019 IRS tax liability and SCS's attorney's fees and for each party to pay their own attorney's fees.

23

Michele filed a Request for Findings of Fact and Conclusions of law. The trial court issued Findings of Fact and Conclusions of Law. The trial court found, among other things, that Michele's removal of the divorce case and both parties' Applications for Protective Orders to bankruptcy court was done to avoid the jurisdiction of the divorce court and forum shop and caused unnecessary expense and attorney's fees; Michele used community funds to gift her daughter the Galveston Home without Damon's consent or agreement; Michele's trial testimony was not credible; Damon did not sign or consent to a noncompete agreement, nondisclosure agreement, or a non-solicitation agreement; and both parties committed waste during the pendency of the divorce. The trial court found that it considered the following factors in making a just and right division: fault in the breakup; relative education of the spouses; disparity in incomes, earning capacities, or business skills; relative age and physical condition of the parties; other financial obligations including attorney's fees; size of any separate estate; whether any particular piece of property has a unique benefit to one party; any gifts between the spouses as well as excessive gifts to children; tax consequences of assets; Michele having committed fraud on the community during the marriage; each party's behavior during the divorce; source of assets used to acquire the community estate; attorney's fees Michele spent to remove the divorce and protective order cases to bankruptcy court and her attempt to prevent those cases from being returned to state

court; attorney's fees Michele spent to prosecute the divorce case and her actions which resulted in increased fees; Michele's failure to attend the last day of trial and submit to further cross-examination; wasting of community assets by both parties; Michele's breach of fiduciary duty; the spouse's earning power and business opportunities; attorney's fees paid and to be paid; and Damon's need for future support.

The trial court's findings of fact include the value of any cash, real property, financial accounts, business interest, motor vehicles, household effects, clothing, and judgments the parties were awarded as well as the value of any liabilities or reimbursement they were ordered to pay. The trial court found the division of community property and liabilities is a just and right division, resulting in slightly above 50% of the community estate being awarded to Damon and slightly below 50% being awarded to Michele. The trial court also found that part of the just and right division of assets and liabilities of the marriage included awarding Damon a $300,000 judgment with interest against Michele. The trial court further found that the community estate was entitled to reimbursement of $30,000 from Michele for funds spent to benefit Michele's separate estate. The trial court denied Michele's Motion for New Trial or Alternatively Motion to Modify, Correct or Reform Final Decree of Divorce.

## ANALYSIS

In six issues on appeal, Michele complains that the trial court made an unequal division of the community estate in Damon's favor. Michele challenges the trial court's findings supporting the division of the community estate, arguing that there is either no evidence or insufficient evidence to support the trial court's findings that she (1) gifted the Galveston home without Damon's consent; (2) committed fraud on the community during the marriage; (3) breached her fiduciary duty; (4) removed the divorce and protective order cases to bankruptcy court and attempted to prevent the case from being returned to state court to avoid the divorce court's jurisdiction and forum shop; (5) caused increased attorney's fees; and (6) that Damon needed future support and did not sign or consent to a nondisclosure agreement.

We review a trial court's division of community property for an abuse of discretion. *See Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). The test for abuse of discretion is whether the trial court acted arbitrarily or unreasonably, or whether it acted without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). The law requires an equitable, not an equal, division of the community estate. *See* Tex. Fam. Code Ann. § 7.001; *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 546 (Tex. 2018) (Devine, J., concurring); *In re Marriage of Harrison*, 557 S.W.3d 99, 140 (Tex. App—Houston [14th Dist.] 2018, pet. denied). A trial court does not abuse its discretion if

there is some evidence of a substantive and probative character to support the division. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

In a bench trial, the judge is the factfinder and the sole judge of the credibility of the witnesses and weight to be given their testimony. *See Murff*, 615 S.W.2d at 700; *Zagorski v. Zagorski*, 116 S.W.3d 309, 318 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). To determine whether the trial court divided the community estate in a "just and right" manner, we must have the trial court's findings of the value of those assets. *Harrison*, 557 S.W.3d at 141. Michele's complaints concern whether legally and factually sufficient evidence supports the trial court's findings. "When a party attacks the legal sufficiency of an adverse finding on an issue on which [she] has the burden of proof, [she] must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)); *see Danner v. Danner*, No. 09-18-00385-CV, 2020 WL 6325725, at *5 (Tex. App. Beaumont Oct. 29, 2020, 2018, pet. denied) (mem op.). In our review of a finding challenged for legal sufficiency, we consider the evidence "in the light most favorable to the verdict and indulge every reasonable inference that would support" the challenged finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). "But if the evidence allows only one inference," we may not disregard the evidence when deciding whether legally

sufficient evidence supports the finding the appellant has challenged in her appeal. *Id.* As applied to Michele's appeal, the standard of review requires that we disregard evidence that contradicts the trial court's finding that Michele challenges unless the trial court, based on the evidence, only had one choice–to find in Michele's favor on the findings she challenges in her appeal. *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006).

We review the trial court's findings of fact for factual sufficiency of the evidence under the same legal standards as applied to review jury verdicts for factual sufficiency of the evidence. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). When a party attacks the factual sufficiency of the evidence on an issue on which she had the burden of proof, "she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242. In a factual sufficiency review, we examine all the evidence and view it in a neutral light. *See id.* But unless the evidence is so weak or the trial court's finding is clearly wrong and unjust given the great weight and preponderance of the evidence, we cannot set the finding the appellant challenges aside when resolving the appeal. *Id.* In other words, we cannot substitute our judgment for the factfinder's if the evidence supports the challenged finding. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (discussing factual sufficiency); *see also In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005) (discussing legal sufficiency).

28

When dividing a couple's marital estate, trial courts have a statutory duty to "order a division of the estate of the parties in a matter that the court deems just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code Ann. § 7.001. Trial courts may consider several factors in dividing a marital estate, including the disparity of incomes and parties' earning capacities, the benefits that a spouse would have derived from the marriage had it continued, each spouse's "business opportunities, education, relative physical conditions, relative financial condition and obligations, disparity of ages, size of separate estates, and the nature of the property." *Murff*, 615 S.W.2d at 699. When the appellant complains the trial court abused its discretion because it did not fairly divide the couple's estate, we will not overturn the trial court's division of the property if the record contains some evidence of a substantive and probative character supporting it. *Hinton v. Burns*, 433 S.W.3d 189, 193 (Tex. App.—Dallas 2014, no pet.) (citing *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied)).

In family law cases, the abuse-of-discretion standard overlaps with the traditional legal and factual sufficiency standards of review, and legal and factual sufficiency issues are not independent grounds asserting error but are factors relevant to the appellate court's evaluation of whether an abuse of discretion occurred. *Hinton*, 433 S.W.3d at 193; *Moroch*, 174 S.W.3d at 857; *see also In re*

*A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.) (discussing standard). To decide whether an abuse of discretion occurred, we consider whether the trial court (1) had sufficient evidence to exercise its discretion and (2) erred in that discretion. *Hinton*, 433 S.W.3d at 193–94; *In re A.B.P.*, 291 S.W.3d at 95. The first prong of this two-part test focuses on whether the ruling the trial court made is supported by sufficient evidence. *Hinton*, 433 S.W.3d at 194; *Moroch*, 174 S.W.3d at 857. In a case in which some evidence supports the trial court's ruling, the second part of the test requires the appellate court to determine whether that evidence, after considering the elicited evidence, shows the ruling the trial court made is one that is reasonable. *Hinton*, 433 S.W.3d at 194; *Moroch*, 174 S.W.3d at 857. We review the record in the light most favorable to the trial court's judgment to determine whether some evidence supports it, and we will uphold the judgment on any legal theory that finds support in the evidence. *Harrison*, 557 S.W.3d at 131.

In issue one, Michele argues the trial court erred by awarding Damon property and assets that belonged to SCS because the Texas Business Organizations Act prohibits the trial court from transferring or interfering with the property rights of a limited liability company. *See* Tex. Bus. Orgs. Code Ann. § 101.106(b). In issue two, Michele complains that the trial court's erroneous award of SCS's equipment to Damon substantially diminished SCS's value because SCS did not have the necessary machinery, equipment, and tools to bid or work on any projects. Michele

30

argues the trial court's finding that these assets did not belong to SCS is contrary to Damon's testimony, lacks evidentiary support, and is so against the overwhelming weight of the evidence as to be manifestly unfair. Michele contends the evidence shows the assets belong to SCS and should have been included in the trial court's award of SCS to her.

When the characterization of property is at issue in a divorce proceeding, the trial court is required to presume that any property possessed by either spouse during the marriage is community property. *Moroch*, 174 S.W.3d at 856; *In re Marriage of Collier*, 419 S.W.3d 390, 402–03 (Tex. App.—Amarillo 2011, no pet.). To overcome the community presumption, a spouse claiming the specific property is not part of the community must trace the property and establish the time and means by which the spouse obtained possession of the property. *In re Marriage of Collier*, 419 S.W.3d at 403.

SCS is a limited liability company, and as such, is a legal entity separate from its members. *See Sherman v. Boston*, 486 S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Damon, as a member of SCS, does not have an interest in any specific property of the company. *See* Tex. Bus. Orgs. Code Ann. § 101.106(b). Property owned by a limited liability company is neither community property nor the separate property of its members. *See id.* § 101.106(a)–(a-1); *Mandell v. Mandell*, 310 S.W.3d 531, 539 (Tex. App.—Fort Worth 2010, pet. denied). The

31

business property that is subject to division in a divorce is the interest in the limited liability company and not the company's specific assets. Tex. Bus. Orgs. Code Ann. § 101.106(a-1) (noting membership interest may be community property), (b) (LLC member does not have interest in any specific company property); *In re Marriage of Collier*, 419 S.W.3d at 403. Additionally, property acquired on the credit of the community is community property. *In re Marriage of Collier*, 419 S.W.3d at 403 (citation omitted).

Michele contends the trial court erred by including the following SCS property in the community estate: the Kubota M56 front loader tractor, Kubota M1489 front loader tractor, all tools, 2018 GMC Denali pickup, 2018 Dodge Ram 3500 pickup, 2011 Kubota UTV, 2018 Kubota lawnmower, 2019 John Deere tractor, 2011 golf cart, scuba diving gear, and proceeds from the sale of the airplane. Michele argues that SCS's financial statements and tax return show the machinery and equipment awarded to Damon were assets of SCS, and McClure's report shows her valuation of SCS was based on SCS's property.

SCS's financial statements do not specifically identify any machinery or equipment, and the tax return's depreciation and amortization report only identifies a 2018 GMC Sierra as a vehicle used more than 50% in a qualified business use. Michele's Inventory and Proposed Division of Property identified the following property as subject to division: proceeds from the sale of the airplane, 2019 John

Deere tractor, 2018 GMC Denali pickup, 2018 Dodge Ram 3500 pickup, Kubota lawnmower, 2011 Kubota UTV, and golf cart. Damon's inventory and Amended Proposed Division lists the Galveston home as community property as well as the 2018 GMC Denali pickup, 2018 Dodge Ram 3500 pickup, 2011 Kubota UTV, 2018 Kubota lawnmower, 2019 John Deere tractor, M56 Kubota, 2011 golf cart, Kubota 1489 front loader tractor, and proceeds from the sale of the airplane. Damon's inventory also lists SCS's business interests, which includes multiple vehicles, equipment, and tools.

During trial, Michele explained that in her bankruptcy she listed SCS's value as $457,000, which was the cash in the company, excluded any accounts receivables, and added the value of all SCS's equipment and assets, which were in their personal names, to their community property. Michele testified Damon took the Kubota UTV, lawn mower, Kubota lawn tractor, his truck, and tools, and she explained that the Kubota tractor and all the vehicles SCS uses were in Damon's name, but she did not know if the Kubota UTV was in his name. Although Michele argues McClure listed and valued SCS's machinery, equipment, furniture, fixtures, vehicles, and leasehold improvements in determining the fair market value of SCS and noted that valuation was based on tangible assets, McClure's report does not list the specific machinery and equipment she considered in her valuation. Additionally, McClure's valuation notes that it is based on tangible assets and assumes that all necessary fixed assets

33

are included in the transaction, but she states she made no attempt to verify title or status of ownership to the assets.

Damon explained he sold the airplane about a year before the trial because it required expensive avionic upgrades, and there were costs associated with the sale, which included hanger fees and maintenance. Damon testified that he would like to have his personal tools that he left at the Imperial Oaks Property, and he valued the tools at approximately $1,500. Damon also testified that he had to purchase new tools and equipment. Damon further testified that he has underwater diving gear and suits that are his personal items even though he also used the gear for work.

Based on our review of the record, Michele failed to offer evidence regarding the means by which the parties obtained possession of the airplane, vehicles, equipment, and tools she complains about. *See In re Marriage of Collier*, 419 S.W.3d at 404. Consequently, we conclude that Michele failed to meet the burden of overcoming the statutory presumption that the complained of property possessed during the marriage was community property. *See id.; Moroch*, 174 S.W.3d at 855. Additionally, the parties' inventories and proposed division of property characterized the property as community property. Based on the record before us, we conclude the trial court did not abuse its discretion by awarding the complained of assets to Damon because there is some evidence of a substantive and probative character to support the division and based on that evidence, the trial court's decision

34

was reasonable. *See Butnaru*, 84 S.W.3d at 211; *Murff*, 615 S.W.2d at 698; *Hinton*, 433 S.W.3d at 193. We overrule issues one and two.

In issue three, Michele complains the trial court erred by attributing the value of the Galveston Home to her because she and Damon gifted that real property to their daughter. Michele complains the trial court could not award the Galveston Home to her because it was not her separate property or part of the community estate, and the trial court erred by including the $280,000 purchase price on her side of the property division ledger. Michele argues the trial court's mischaracterization of the Galveston Home as community property materially affected the just and right division of the community estate. Michele further argues that Damon offered no evidence to overcome the presumption of the property being a gift to their daughter.

The record shows that during trial, Michele's attorney agreed that the $280,000 for the Galveston Home should be included as one of Michele's assets in the property division, and her inventory and proposed division of property includes the Galveston Home as community property that should be awarded to her. Damon's Inventory and Amended Proposed Division also lists the Galveston Home as community property. The evidence before the trial court also showed that in 2019, Damon received $968,816 in distributions from SCS and Michele received $1,587,432 in distributions, which included $279,362 for the purchase of the Galveston Home. Also, in her bankruptcy filing, Michele disclosed that in 2019, she

35

received $415,129 in distributions from SCS, which included the money to purchase the Galveston Home.

Michele testified that when she purchased the Galveston Home in July 2019, she did not discuss the purchase with Damon. Damon testified that he did not approve the purchase of the Galveston Home, and he asked the trial court to either impose a constructive trust on the home or consider it as part of his waste claim. While Michele testified that she used proceeds from her individual Merrill Lynch account to purchase the Galveston Home, she also testified that she transferred money from her individual Merrill Lynch account into SCS's checking and then into her personal account to pay her personal expenses.

The trial court found that during the marriage, Michele used community funds to gift their daughter the Galveston Home without Damon's consent or agreement and that the transfer did not benefit the community estate. The trial court also found Michele's trial testimony was not credible and considered that Michele committed fraud on the community during the marriage. As the sole judge of the credibility of the witnesses and weight to be given their testimony, the trial court was free to disbelieve Michele's testimony regarding her purchase of the Galveston Home. *See Murff*, 615 S.W.2d at 700. We conclude the trial court did not abuse its discretion by including the Galveston Home in the division of the community estate and awarding Michele the Galveston Home because there is some evidence of a substantive and

probative character to support the division and based on that evidence, the trial court's decision was reasonable. *See Butnaru*, 84 S.W.3d at 211; *Murff*, 615 S.W.2d at 698; *Hinton*, 433 S.W.3d at 193. We overrule issue three.

In issue four, Michele argues the trial court erred by entering a judgment against her for $300,000 to equalize the division of community assets because the trial court had already made an unequal division in Damon's favor. Michele contends the $300,000 judgment against her was detrimental and had no justification. Michele explained that Damon alleged she committed fraud on the community by purchasing the Galveston Home, but she argues that the evidence does not support the trial court's finding that she committed actual fraud on the community. Michele also argues there is no evidence of fraud by her or that she breached her fiduciary duty to the community.

"A fiduciary duty exists between a husband and a wife as the community property controlled by each spouse." *Puntarelli v. Peterson*, 405 S.W.3d 131, 137 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no writ) (op. on reh'g). Each spouse owns an undivided one-half interest in all community assets and funds regardless of which spouse has control, and a relationship of trust and confidence exists which requires that a spouse's disposition of community property be fair to the other spouse. *Massey v. Massey*, 807 S.W.2d 391, 401–02 (Tex. App.—Houston [1st

Dist.] 1991, writ denied). The managing spouse has the burden to prove that her disposition of community property was fair, and the trial court may consider a spouse's disposition when making a just and right division. *Slicker v. Slicker*, 464 S.W.3d 850, 861–62 (Tex. App.—Dallas 2015, no pet.); *Massey*, 807 S.W.2d at 402 (citations omitted).

A claim that a spouse committed fraud on the community must be asserted for consideration in the trial court's just and right division of the community estate. *Chu v. Hong*, 249 S.W.3d 441, 444–45 (Tex. 2008). The evidence presented regarding fraud on the community is relevant to the property division, and the trial court may consider a wrong by one spouse to justify an unequal division of property. *See Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998) (citation omitted); *Markowitz v. Markowitz*, 118 S.W.3d 82, 90–91 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (plurality on reh'g). Fraud is presumed when one spouse disposes of the other spouse's interest in community property without the other spouse's knowledge or consent. *Cantu v. Cantu*, 556 S.W.3d 420, 427 (Tex. App.—Houston [14th Dist.] 2018, no pet.). The presumption can arise by evidence of specific transfers or gifts of community assets outside of the community and by evidence that community funds are unaccounted for by the spouse in control of those funds. *Id.* Once the presumption arises, the burden of proof shifts to the disposing spouse to prove the fairness of the disposition of the other spouse's one-half community

ownership. *Id.*; *Puntarelli*, 405 S.W.3d at 138. While a spouse may make moderate gifts for just causes to persons outside the community, an excessive gift may be set aside as a constructive fraud on the other spouse, and no dishonesty of purpose or intent to deceive is required to establish constructive fraud. *Puntarelli*, 405 S.W.3d at 138–39; *Mazique v. Mazique*, 742 S.W.2d 805, 808 (Tex. App.—Houston [1st Dist.] 1987, no writ).

When the trial court makes a finding of fraud, it must determine the value by which the community estate was depleted as a result of the fraud on the community and the amount of the reconstituted estate. Tex. Fam. Code Ann. § 7.009(b); *Cantu*, 556 S.W.3d at 427. The reconstituted estate is the total value of the community estate that would have existed had the fraud not occurred. Tex. Fam. Code Ann. § 7.009(a). A trial court can achieve a just and right division of the community estate by awarding a disproportionate share of the remaining community assets to the wronged spouse or by awarding a money judgment to the wronged spouse against the spouse who committed fraud, or a combination of both. *Id.* § 7.009(c); *see Murff*, 615 S.W.2d at 699.

In his First Supplemental Petition to Petitioner's Third Amended Petition for Divorce, Damon alleged that during the divorce proceeding and in violation of the Montgomery County's First Amended Standing Order Regarding Children, Pets, Property and Conduct of the Parties, Michele breached her fiduciary duty and

committed fraud by purchasing the Galveston Home in their daughter's name with community property funds. During trial, Michele testified that when she purchased the Galveston Home for $279,361, she did not discuss the purchase with Damon, and Damon testified that he did not approve the purchase of the Galveston Home. Michele testified that she did not know she was under standing orders from Montgomery County when she made the purchase. Michele also testified that she paid the expenses on the home, and the property taxes were paid directly by SCS and written off as a distribution. Damon testified that Michele spent approximately $315,000 on the Galveston Home's purchase, improvements, and maintenance.

As the factfinder, the trial court had the exclusive right to exercise its discretion by believing that Michele did not have Damon's knowledge or consent to use community property to purchase the Galveston Home. *See Murff*, 615 S.W.2d at 700. We conclude the evidence does not conclusively establish that as the managing spouse, Michele purchased the Galveston home with Damon's knowledge or consent or that the evidence the trial court relied on to conclude Michele did not have Damon's knowledge or consent is so weak it is outweighed by the greater weight and preponderance of the evidence admitted at trial. *See Dow Chem. Co.*, 46 S.W.3d at 242. We further conclude the evidence does not conclusively establish that Michele disposed of community property in a manner that is fair to Damon or that the evidence the trial court relied on to conclude Michele did not dispose of

40

community property in a manner that was fair to Damon is so weak it is outweighed by the greater weight and preponderance of the evidence admitted at trial. *See id.*; *see also Slicker*, 464 S.W.3d at 862; *Massey*, 807 S.W.2d at 401.

In making a just and right division, the trial court could have considered the evidence that was presented showing that Michele committed fraud on the community and breached her fiduciary duty, and after accounting for the $300,000 judgment, the trial court then awarded Damon slightly more than 50% of the community estate. We conclude the trial court did not abuse its discretion by finding that part of the just and right division included awarding Damon a $300,000 judgment with interest against Michele because there is some evidence of a substantive and probative character to support the division and based on that evidence, the trial court's decision was reasonable. *See Butnaru*, 84 S.W.3d at 211; *Murff*, 615 S.W.2d at 698; *Hinton*, 433 S.W.3d at 193. We overrule issue four.

In issue five, Michele contends the trial court abused its discretion by entering an unfair division of property in Damon's favor. Michele explained that she had less education, work experience, earning capacity, and business experience than Damon, and as the innocent spouse, she would have received substantially greater benefits had the marriage continued. Michele also explained that she suffered Damon's emotional and physical abuse, tolerated his alcoholic rages, and was the victim of

41

his adultery and intentional acts to damage SCS. Michele maintains that the trial court failed to divide the marital estate in a just and right manner.

During the trial, the trial court considered evidence about the non-exclusive factors that a judge is to consider in determining a just and fair property division, including fault in the breakup; the spouses' education and work experience; their earning capacities, business experience, and business opportunities; their age and health; the current disparity in their income; the nature of the community property; the size of the separate estate; and the benefit the spouse not at fault would have received had the marriage continued. *See Murff*, 615 S.W.2d at 698; *Villalpando v. Villalpando*, 480 S.W.3d 801, 807 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citation omitted). The judge had the opportunity to see both parties testify and to judge their credibility, and the judge found Michele's testimony was not credible.

Under these circumstances, we conclude the trial court did not abuse its discretion in awarding Damon a disproportionate share of the community estate because the trial court had sufficient information to exercise its discretion and did not divide the community estate in a manner that is manifestly unjust or unfair. *See Murff*, 615 S.W.2d at 698–99; *Villalpando*, 480 S.W.3d at 807. We overrule issue five.

In issue six, Michele challenges the trial court's findings concerning the division of the community estate, alleging there is legally and factually insufficient

42

evidence to support the findings. Michele argues the evidence does not support the trial court's finding that Damon needed future support because he left the marriage with over $1,075,000 from his Merrill Lynch account, set up a competing business, and had years of experience in the concrete renovation and construction business. In making its determination of a just and right division, the trial court found that it considered Damon's need for future support. We focus on the whether the trial court's finding was reasonable based on the evidence admitted at trial. As the party who complains about the adverse finding, Michele must establish that either the evidence in the trial court conclusively established Damon did not need future support, or that the evidence the trial court relied on to conclude Damon needed future support is so weak it is outweighed by the greater weight and preponderance of the evidence admitted at trial. *See Danner*, 2020 WL 6325725, at \*5, 7.

The trial court heard evidence that there had been a disparity in earning power, and that in 2019 and 2020, Damon had no income. The trial court heard Damon testify that although he created TSR, he had to wait until the divorce was finalized to conduct business because of the alleged noncompete agreement. The trial court also considered Damon's testimony that he needed money to reestablish himself because he lost his earning capacity due to the alleged noncompete agreement and because Michele had "badmouthed" him in the industry. We conclude the is legally and factually sufficient. The evidence does not conclusively establish that Damon

43

did not need future support and the evidence the trial court relied on to conclude that Damon's needs for future support was a factor in making a just and right division is not so weak that it is outweighed by the greater weight and preponderance of the evidence admitted at trial. *See id.*

Michele also complains about the trial court's findings that her removal of the divorce and protective order cases to bankruptcy court and her attempt to prevent the cases from being returned to state court was done to avoid the divorce court's jurisdiction and forum shop and caused the parties to expend unnecessary expenses and attorney's fees. Michele argues she was justified in filing bankruptcy, and Damon presented no evidence she was forum shopping or attempting to avoid discovery.

Damon testified that he believed Michele fraudulently filed bankruptcy after spending excessively and that he had to pay approximately $75,000 in attorney's fees to have his divorce case remanded back to state court. He also explained that Michele failed to cooperate with the litigation and discovery requests before filing bankruptcy, and her behavior hindered the process and caused him to incur excess attorney's fees. The trial court considered evidence that the bankruptcy court found that forum shopping was an issue in Michele's bankruptcy case because the removal of a property division incident to a divorce to a Federal Bankruptcy Court was not a normal or typical occurrence. Michele agreed that the bankruptcy court found that

forum shopping was an issue but claimed she filed bankruptcy because she tried to stop Damon's attorney from getting attorney's fees. Michele testified that she filed bankruptcy before she had to turn over the native Quickbooks and before two SCS employees could be deposed. Michele also testified that she filed a motion for reconsideration of the remand order, which was denied.

We conclude the evidence does not conclusively establish that Michele's removal of the divorce and protective order cases to bankruptcy court and her attempt to prevent the cases from being returned to state court was not done to avoid the divorce court's jurisdiction and forum shop and did not result in unnecessary expenses and attorney's fees. *See id.* We further conclude that the evidence the trial court relied on to conclude that Michele's removal to bankruptcy court and her attempt to prevent the cases from being returned were factors in making a just and right division is not so weak it is outweighed by the greater weight and preponderance of the evidence admitted at trial. *See id.*

Michele challenges the trial court's finding that Damon did not sign or consent to a nondisclosure of SCS's confidential information. Michele testified that she had Damon's consent to cut and paste a copy of his electronic signature on the Regulations Hoffman prepared, which did not contain any noncompete, non-solicitation, or confidentiality clauses. Michele also testified that she created the Employment Noncompetition and Confidentiality Agreement in 2010 and backdated

45

it to 2001, and she cut and pasted Damon's electronic signature on the agreement with his permission. Michele explained that in addition to Damon's 49%-member interest in SCS, he received a $60,000 yearly salary as consideration for signing the agreement.

Damon explained that he never saw, signed, or authorized Michele to sign a document that would prevent him from competing or soliciting business or clients, and he never received a $60,000 salary from SCS as compensation for signing the alleged noncompete agreement. Damon testified that the noncompete agreement indicates it was created in 2001, but it contains the Imperial Oaks property's address, which they acquired in 2008. Damon explained he would never have signed the agreement because it made no sense when he provided the knowledge and experience to SCS. Hughes testified that SCS's original Regulations that were created in 2002 did not contain noncompete or the non-solicitation language and that the altered document containing the noncompete and non-solicitation language was created in 2018 and stored in a folder titled "divorce[.]"

As the factfinder, the trial court had the exclusive right to exercise its discretion by believing Damon's testimony that he never signed the agreement. *See Murff*, 615 S.W.2d at 700. We conclude the evidence does not conclusively establish that Damon signed the agreement or that the evidence the trial court relied on to conclude Damon did not sign or consent to the agreement is so weak it is outweighed

46

by the greater weight and preponderance of the evidence admitted at trial. *See Dow Chem. Co.*, 46 S.W.3d at 242. On appeal, Michele argues that Damon's consent is irrelevant because he has a common law duty of nondisclosure. Based on our review of the record, this argument is not preserved for our review because Michele did not make the argument at trial. *See* Tex. R. App. P. 33.1.

Michele also challenges the trial court's findings that she committed fraud on the community during the marriage and breached her fiduciary duty. We have already explained in issue four that the evidence was sufficient to support the trial court's findings that Michele committed fraud on the community and breached her fiduciary duty by using community funds to purchase the Galveston Home without Damon's knowledge or consent and that by doing so, she did not dispose of community property in a manner that was fair to Damon. We overrule issue six. Having overruled each of Michele's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on June 16, 2022
Opinion Delivered November 17, 2022

Before Golemon, C.J., Kreger and Johnson, JJ.