Tracy Christopher, Justice *424 In this divorce case, the trial court found that the husband committed a fraud on the community, but instead of awarding the wife a money judgment in damages for the fraud, the trial court gave the wife a disproportionate share of the remaining community assets. The questions that we must consider are (1) whether the trial court abused its discretion by making the disproportionate division, (2) whether the trial court's finding of fraud was supported by reliable expert testimony, and (3) whether the trial court erred by not making additional findings of fact that more particularly described its finding of fraud. For reasons explained more fully below, we conclude that the trial court did not abuse its discretion in its division of the community estate, that the reliability complaint was not preserved for appellate review, and that the trial court was not required to make additional findings of fact. We therefore affirm the trial court's judgment.
BACKGROUND
At the beginning of their marriage in 1979, Rick and Dora were both working as pharmacists, but Rick encouraged Dora to pursue a career in medicine, so she went back to school, became a medical doctor, and eventually acquired her own ophthalmology practice. Rick also acquired his own practice. Over the course of the marriage, he opened five pharmacies and two clinics, all of which he managed himself.
Great wealth came with the couple's professional success, but the marriage still experienced some difficulties. In 1985, six months after the birth of their first child, Dora learned that Rick had been cheating on her. Dora forgave Rick, believing that the affair was an isolated indiscretion.
In 2000, Dora filed for divorce because Rick had become verbally and physically abusive. He berated her for appearing "old" and "wrinkled." He criticized her for never making enough money. He also struck her and choked her and kept her up at night with demands for sex. After a short separation, Dora reconciled with Rick and abandoned her divorce action.
In 2013, Dora suspected that Rick was being unfaithful again, so she hired a private investigator. When the private investigator confirmed her suspicions, Dora filed for divorce for the second time.
Dora soon learned that Rick's infidelity had spanned nearly the entire marriage. During his deposition, Rick confessed to having affairs for the past thirty years. He described his cheating as "normal, in the norm of marriages," and he testified that he had been with so many other women that he could not remember all of their names-not even when he was shown their pictures.
Rick met most of his paramours through dating websites, where he represented himself as a high-worth individual. He took these women on dates and shopping sprees and trips to other cities. He paid their rents and their car notes. He even employed some of them at his pharmacies and gave them seed money for their start-ups.
Rick funded these affairs with his business accounts. He testified that he used company credit cards and petty cash out of the pharmacy till.
Dora sought an accounting of Rick's businesses to understand the full scope of his affairs, so she hired Karon Murff, a *425 certified public accountant who specializes in white collar crime. Murff pored through more than 30,000 pages of Rick's books, but despite that volume of data, Murff only received access to a limited portion of Rick's business records because Rick destroyed some of those records in advance of trial.
During the discovery period, a digital forensics analyst went to one of Rick's business locations for the purpose of imaging Rick's computers. The analyst arrived to find Rick running a scrubbing program, which caused the permanent deletion of certain electronic files. The analyst found the same program installed on the main computer at each of Rick's business locations.
Rick claimed that he routinely scrubbed his computers to make them run more efficiently, but he ran this scrubbing program after the trial court had already enjoined him from destroying his records and after Dora had sent a letter specifically warning against the spoliation of evidence.
Based on the partial records that she was able to review, Murff issued a report opining that more than $7 million were either missing from Rick's accounts or were spent in transactions that did not benefit the community estate.
Rick did not dispute that he spent community assets on his affairs, but he never identified the exact amount of his fraud. He also rejected Murff's assertion that his fraud exceeded $7 million. He claimed that a large portion of the funds identified in Murff's report never even existed.
In defense of his claims, Rick produced his own expert witness, William Stewart, who was also an accountant. Stewart did not review any of the underlying records that Murff had reviewed, but he opined that Murff had committed fatal errors by making her conclusions without sufficient data.
Rick also produced one of his employees, Angie Mendez, who testified about the operating practices of Rick's businesses and about various transactions that Murff had flagged as questionable. Mendez claimed that Rick never took petty cash from his businesses (controverting Rick's own testimony). She also traced the money behind some of Murff's flagged transactions, and she explained that those transactions could not have been fraudulent because they benefitted the businesses or the community estate.
After a nonjury trial, the trial court issued findings of fact and conclusions of law. Among the trial court's findings, the court found that Rick was not a credible witness, that he spoliated evidence, and that he committed a fraud on the community in the amount of $3,911,805.
The trial court then divided the community estate, which included all of the parties' community assets except for their respective businesses. The parties privately agreed that Dora would keep her ophthalmology practice and that Rick would keep the pharmacies and clinics. No values were assigned to these businesses on the parties' inventory of assets. As for the remaining community property, the trial court awarded Dora a net estate valued at more than $5.8 million and Rick a net estate valued at more than $4.6 million. This division effected a split of roughly 55% to Dora and 45% to Rick.
Under this same division of property, the full dollar amount of Rick's fraud was allocated to Rick as an asset, rather than a liability, and it composed the bulk of Rick's net estate. Of course, that dollar amount did not represent money that could actually be spent after the divorce. Quite the opposite, it represented the amount of community assets that Rick was found to *426 have squandered during the marriage. To use Rick's own words, the fraud amount is a "phantom"-i.e., a fiction, or specter of property once had. If the phantom were removed from the community estate and the division of property were otherwise kept the same, then for purposes of calculation only, the value of Rick's net estate would be reduced to around $770,000, and the split would widen to 88% to Dora and 12% to Rick.
DIVISION OF THE COMMUNITY ESTATE
In his first issue on appeal, Rick challenges the trial court's division of the community estate, with the primary focus centering on the trial court's finding of fraud.
I. Standard of Review
The trial court is afforded wide discretion when dividing the community estate. See Schlueter v. Schlueter , 975 S.W.2d 584, 589 (Tex. 1998). We presume that the trial court exercised that discretion properly, and we will only disturb the trial court's decision upon a showing that the court clearly abused its discretion. See Murff v. Murff , 615 S.W.2d 696, 699 (Tex. 1981) ; Willis v. Willis , 533 S.W.3d 547, 551 (Tex. App.-Houston [14th Dist.] 2017, no pet.).
We engage in a two-pronged inquiry when deciding whether the trial court abused its discretion: first, we consider whether the trial court had sufficient evidence upon which to exercise its discretion; and second, we consider whether the trial court erred in its application of that discretion. See In re M.C.K. , No. 14-17-00289-CV, 2018 WL 1955065, at *4 (Tex. App.-Houston [14th Dist.] Apr. 26, 2018, no pet.) (mem. op.).
The first prong draws on our traditional standards for legal and factual sufficiency review. Under the legal sufficiency standard, we credit all evidence and inferences favorable to the trial court's decision if a reasonable factfinder could, and disregard all evidence contrary to that decision unless a reasonable factfinder could not. See City of Keller v. Wilson , 168 S.W.3d 802, 828 (Tex. 2005). The evidence is legally insufficient if the evidence at trial would not allow reasonable and fair-minded people to find the fact at issue. Id. at 827. Under the factual sufficiency standard, we examine all of the evidence in a neutral light and consider whether the trial court's decision is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. See Dow Chem. Co. v. Francis , 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).
With the second prong, we consider whether the trial court made a reasonable decision based on the admitted evidence. See M.C.K. , 2018 WL 1955065, at *4. Stated inversely, we must determine whether there is some basis for concluding that the trial court's decision was neither arbitrary nor unreasonable. Id. If there is no evidence in support of the trial court's division of the community estate, or if the division is manifestly unjust and unfair, then we must conclude that the trial court abused its discretion. See Bradshaw v. Bradshaw , 555 S.W.3d 539, 543 (Tex. 2018) (plurality op.) (citing Hedtke v. Hedtke , 112 Tex. 404, 248 S.W. 21, 23 (1923) ); Willis , 533 S.W.3d at 551.
II. Applicable Law
The trial court's division of the community estate must be just and right, having due regard for the rights of each spouse. See Tex. Fam. Code § 7.001. Although a court may consider fault in the breakup of the marriage, a just and right division should not be punitive against the *427 errant spouse. See Young v. Young , 609 S.W.2d 758, 762 (Tex. 1980). A just and right division need not be equal either, but it must be equitable. See Zeptner v. Zeptner , 111 S.W.3d 727, 740 (Tex. App.-Fort Worth 2003, no pet.).
These same principles apply even in cases of fraud on the community. When the court makes a finding of fraud, it must perform two calculations: the first is the "value by which the community estate was depleted as a result of the fraud on the community," and the second is "the amount of the reconstituted estate." See Tex. Fam. Code § 7.009(b)(1). The reconstituted estate is defined as the total value of the community estate that would have existed if a fraud on the community had not occurred. Id. § 7.009(a). After making these calculations, the court must "divide the value of the reconstituted estate between the parties in a manner the court deems just and right." Id. § 7.009(b)(2). The court can achieve a just and right division by awarding a disproportionate share of the remaining community assets to the wronged spouse, by awarding a money judgment to the wronged spouse against the spouse who committed the fraud, or by a combination of these two methods. Id. § 7.009(c).
Fraud is presumed whenever one spouse disposes of the other spouse's one-half interest in community property without that other spouse's knowledge or consent. See Miller v. Miller , No. 14-17-00293-CV, 2018 WL 3151241, at *5 (Tex. App.-Houston [14th Dist.] June 28, 2018, no pet. h.) (mem. op.). This presumption can arise not only by evidence of specific transfers or gifts of community assets outside of the community, but also by evidence that community funds are unaccounted for by the spouse in control of those funds. Id. at *6. Once the presumption of fraud arises, the burden shifts to the disposing spouse to prove the fairness of the disposition. Id. at *5.
III. Analysis
Rick concedes that there is sufficient evidence to support the trial court's division of the parties' tangible estate, but he does not concede the same as to the trial court's finding of fraud. He argues that the trial court abused its discretion by making that finding and by awarding him a phantom asset of $3,911,805 because there is legally and factually insufficient evidence to show that he committed a fraud in that amount.
To resolve this dispute, we turn to the evidence produced by Dora's expert, Karon Murff. If, from that and other record evidence, the trial court had a substantial basis for concluding that Rick committed a fraud on the community in the amount of $3,911,805, then we must not disturb the trial court's finding.
A. The finding of fraud is supported by the evidence.
Through both her live testimony and her report, which was admitted into evidence with the agreement of the parties, Murff explained that Rick's fraud totaled $7,076,963. That figure represents the summation of eleven different categories of fraud. We address each of those categories in turn.
1. Pharmacies
We start with the fraud arising out of Rick's pharmacy business, which represents the largest category of fraud in Murff's report. This category is actually so large that Murff divided it into three subcategories.
The first subcategory focuses on a shortage of deposits. For the five-year period between October 2009 and September 2014, Murff compiled data from internal *428 sales recaps, Quickbook records, and bank statements. The recaps were worksheets produced by the pharmacy computers, and they recorded such information as the total number of prescriptions filled and the total amount of sales in dollars.
Based on the historical data from that five-year period, Murff found that Rick's pharmacies recorded sales of $12,510,148. But during the same period of these sales, Murff found that the pharmacy registers recorded income of only $10,187,193. That leaves a discrepancy of $2,322,955, which Murff could not account for.
The shortage of funds gives rise to a presumption of fraud on the community because the pharmacy accounts were under Rick's control. Cf. Puntarelli v. Peterson , 405 S.W.3d 131, 139 (Tex. App.-Houston [1st Dist.] 2013, no pet.) (wife's testimony that funds appeared to be missing from husband's account gave rise to a presumption of fraud on the community). The burden accordingly shifted to Rick to explain the shortage.
Rick argued that the shortage could be explained by price adjustments, using a metric known as Average Wholesale Price (AWP), or by reimbursements that were negotiated down by Medicare, Medicaid, and private insurance.
Murff addressed these explanations. She wrote in her report that she searched for records indicating the use of AWP, but none could be found. She also testified that, based on her review of the records, "in general, the pharmacies didn't accept insurance." Murff explained that she found only one year in which Medicaid sales were reflected in the recaps, and the sales were small-only $23,830.
Rick provided no documents to corroborate his explanations. Considering the testimony that Rick engaged in the spoliation of evidence, and the fact that the trial court was able to assess the witnesses' credibility and demeanor, the trial court was more than free to believe Murff's testimony over Rick's. Cf. Miller , 2018 WL 3151241, at *8 (holding that the trial court "was not required to credit [the husband's] testimony that all community funds disposed of were used for community purposes").
The second subcategory focuses on funds from a particular bank account. Murff analyzed bank statements from Wachovia Bank (now Wells Fargo) for the period between October 2009 and July 2010. In those statements, Murff found $375,280 in deposits from one of Rick's pharmacies. But according to Murff, those same deposits were not accounted for in the pharmacy's Quickbooks, and at the time of trial, Murff testified that the disposition of those deposits remained unknown. Rick provided no explanation for what happened to the deposits.
The third subcategory focuses on the period between October 2014 and August 2016 (the time of Murff's report), for which Rick failed to provide reports of his pharmacies' financial records. Because Murff did not have any data for this period, she performed an extrapolation analysis. Looking at historical data from the previous five-year period between October 2009 and September 2014, Murff determined that there was an average monthly discrepancy of $37,981 between the pharmacies' sales and the pharmacies' deposits. By extending this discrepancy over the extrapolation period of twenty-three months, Murff opined that there was a shortage of $873,564.[1]
*429 Rick argues that Murff erroneously assumed that all five of his pharmacies remained open during the extrapolation period, and he points to undisputed testimony that some of them were actually closed or conveyed to a third party. This argument has merit. During her cross-examination, Murff acknowledged that she did not readjust her extrapolation figure after learning of the closures and conveyances. For purposes of argument, we will assume that the trial court did not credit Murff's extrapolation figure in its calculation of sums attributable to fraud on the community.
Based on the other two subcategories, the evidence is legally and factually sufficient to support a finding that Rick committed a fraud on the community in the amount of $2,698,235.[2]
2. Clinics
In the second category of fraud, Murff analyzed data from the two clinics that Rick owned and operated. The first clinic, the "Airline Clinic," opened in April 2013, and the second clinic, the "Bellaire Clinic," opened in August 2014. For both of these clinics, Murff was able to review monthly bank statements that were current through April 2016. However, Murff was not able to review all of the monthly sales reports that were generated by the two clinics. For the Airline Clinic, Murff did not have any sales reports for the nineteen-month period between October 2014 and April 2016. And for the Bellaire Clinic, Murff did not have any sales reports for the thirteen-month period between March 2015 and April 2016.
For these combined thirty-two months of missing data, Murff estimated the clinics' monthly revenue using two different methods. The first method was based on the clinics' average monthly income once the clinics were established and operating. The second method was based on the average number of patients and the average fee per patient. Both methods produced comparable figures, but Murff proceeded with the second method because it was the more conservative of the two.
Under this second method, Murff assumed that each clinic served 750 patients per month, with an average fee per patient of $89.54, for a total revenue figure of $67,155 per clinic per month. When that assumed revenue figure is applied to the combined thirty-two month period for which Murff did not have sales reports, and then added to the known revenue figures from the periods in which she did have sales reports, Murff calculated that the clinics should have had total deposits in the amount of $3,226,432. There was a discrepancy, however. Murff found that the bank statements reflected deposits of only $2,405,635, for a shortage of $820,797. Murff then made an extrapolation for the four-month period between May 2016 and August 2016 (the time of her report), and she concluded that the total amount missing from the clinics' bank accounts was $1,054,926.
Rick does not account for where that money went, but he disputes that some of it ever existed. His dispute focuses on Murff's assumption that each clinic serves 750 patients per month. Rick asserts that this figure may be accurate as to the Airline Clinic, but not the Bellaire Clinic. According to Rick, the Bellaire Clinic only serves between 300 and 350 patients per month.
Murff acknowledged that her limited sample of sales reports did not support the assumption that the Bellaire Clinic serves an average of 750 patients per month. Based on the reports that she was able to *430 review, the Bellaire Clinic served only 313 patients in its busiest month. Nevertheless, Murff explained that she proceeded with the higher assumption of 750 patients per month because Rick testified during his deposition that both clinics saw that volume of patients.
For the sake of argument, we can adjust Murff's calculation using the more conservative assumption that the Bellaire Clinic serves an average of only 300 patients per month, instead of 750 patients per month. Under this revised assumption, Murff overestimated the Bellaire Clinic's revenue by $523,809.[3] But even when this overestimation is subtracted from Murff's figure of $1,054,926, there is still a balance of $531,117, which Rick has not accounted for.
The evidence is legally and factually sufficient to support a finding that Rick used his clinics to commit a fraud on the community in the amount of $531,117.
3. Credit Cards
In the third category of fraud, Murff analyzed a collection of credit card statements from the period between January 2009 and October 2014. The statements corresponded with nineteen different credit cards, all of which were charged to the expense accounts for the businesses owned by Rick.
Murff opined that many of the charges appeared to be personal, rather than business-related. For example, the charges reflected transactions for gas, groceries, clothing, jewelry, and hotels, among others. Collectively, these charges totaled $358,271.
Relying on Rick's deposition testimony that he used company funds to pay for his affairs, including his paramours' living expenses, Murff assumed that all of those personal charges were fraudulent. She then performed an extrapolation analysis through 2015, and opined that there was another $143,310 in fraud. Finally, she found bank statements in 2016 reflecting total credit card payments of $275,333. Because she did not have the credit card statements for those charges, she assumed that all of those charges were fraudulent as well. In all, Murff opined that Rick used his credit cards to commit a fraud on the community in the amount of $776,914.
Dora did not personally review the credit card statements to consider whether she was familiar with any of the charges that Murff assumed to be fraudulent, which is significant because one of the nineteen cards identified by Murff was specifically issued in Dora's name. Two of the other cards were issued in the names of the couple's son and daughter. Another was issued in Rick's name, and some of the charges under that card appear to have benefitted the children, rather than Rick's paramours. These charges included law school admission fees and golfing expenses. During the time of these charges, the couple's son was applying to law school, and the daughter was a nationally ranked golfer.
One of the nineteen credit cards was issued in the name of Tiffany Camiro, with whom Rick admitted to having an affair. According to the records, Camiro charged $2,188 to her credit card, and Rick paid those charges using business funds. Rick provided no explanation for why those payments were fair.
For purposes of our analysis, we will assume that the trial court considered only *431 the $2,188 in credit card charges made by Camiro in its calculation of sums attributable to Rick's fraud.
4. Cash Gifts
In the fourth category of fraud, Murff identified certain payments that appeared in Quickbook records and bank statements. The payments benefitted four women identified as Rick's paramours, all of whom worked for Rick at some time.
The first paramour was Johana Cardoso. Murff found that Rick gave her a loan for $10,001.
The second paramour was Ashley Cortez. Murff found that Rick gave her a $1,500 loan and another $19,338 in non-payroll checks, for a total of $20,838.
The third paramour was Lindsay Nutter. Murff found that Rick gave her $21,741.
The fourth paramour was Angie Mendez, who testified during the trial. Murff found that Rick gave her $6,614.
Murff classified the loans as gifts because there were no records showing that the loans, if real, were ever repaid. Rick offered his bare testimony that Cardoso repaid her loan, but the trial court was not required to believe him.
Rick had no recollection of ever paying Cortez. The trial court was not required to believe that testimony either.
Rick testified that the payments to Nutter were wages, but Murff traced the payments to Nutter's start-up company. Again, the trial court was free to reject Rick's explanation.
Rick could not explain the payment to Mendez, but he claimed that she was not one of his paramours. Mendez similarly denied any sort of romantic relationship with Rick. But Rick's accounting expert, William Stewart, testified that Rick admitted to having an affair with Mendez.
The evidence is legally and factually sufficient to support a finding that Rick committed a fraud on the community based on all of these payments, for a total of $59,194.
5. Unaccounted for Withdrawals
In the fifth category of fraud, Murff identified seventy-four withdrawals from known bank accounts between June 2009 and April 2016. Many of the withdrawals came from bank accounts associated with Rick's pharmacies and clinics, but Murff could trace none of them back to community assets. Murff calculated the sum of these seventy-four withdrawals at $669,794.
Angie Mendez, Rick's clinic administrator, provided live testimony regarding twenty-eight of the withdrawals. Mendez explained that some of the withdrawals were for petty cash, which the staff would use for weekend lunches. Other withdrawals were transfers from one clinic to another to cover that other clinic's operating expenses, or loan payments to the pharmacies, which also subsidized the clinics. Other withdrawals took the form of Rick's compensation, as his director's fee or management fee.
Mendez provided no documentation to support her explanations, and given the testimony that Mendez may have been one of Rick's paramours, the trial court was not required to credit Mendez's live testimony. However, if we were to assume for the sake of argument that the trial court did credit Mendez's live testimony, then the twenty-eight withdrawals identified by Mendez would account for only $114,000.
The record contains copies of checks, withdrawal slips, and other exhibits, which could potentially explain seven more withdrawals.
*432 These records indicate that some withdrawn funds were transferred to another bank or a male individual, whereas others were used to purchase investments or pay for property taxes or the couple's Mercedes. If those purposes are true, then these seven withdrawals still account for only $176,636. For the sake of argument, we will assume that the trial court excluded these withdrawals from its calculation of fraud.
That still leaves thirty-nine withdrawals, collectively worth $379,160, for which Rick has provided no accounting or explanation at all. The evidence is legally and factually sufficient to support a finding that Rick committed a fraud on the community in that amount.
6. Loan Repayments
In the sixth category of fraud, Murff looked at Quickbook records from the pharmacies, which showed a separate "loan to officer" account. Murff found that monies flowing through this account were classified as loan repayments to Rick. Murff suggested that the account was operating more as a draw account than a loan account, perhaps as a means of withdrawing funds without having to report the transactions through income and expense statements.
Murff could not find any documentation to substantiate the existence of a loan from Rick to any of the pharmacies. Nor could she find any evidence that interest income was ever being reported.
Murff found that $260,100 left the company under this loan repayment scheme, and that the disposition of those funds was not ascertainable. Murff suggested, however, that the money could have been cleared had more information been provided during discovery.
Rick, for his part, provided no explanation for the loan-repayment money or its disposition, although his expert, Stewart, opined that an exchange of loans between a small business owner and the business itself did not support a claim of fraud.
For the sake of argument, we will assume that the trial court did not include any amount under this category in its calculation of fraud.
7. Consulting Fees to Growing Innovations
In the seventh category of fraud, Murff found that Rick paid consulting fees to a company known as Growing Innovations, which was registered to the couple's son. The fees totaled $131,500, and Murff opined that they were fraudulent because there was no evidence of a consulting contract and because Rick testified that he had no knowledge of the payments.
Dora testified that money that was disbursed to her son's company should not be included in a calculation of fraud. We therefore assume that the trial court did not consider any funds under this category.
8. Girlfriend Expenses
In the eighth category of fraud, Murff identified four questionable expenditures in Quickbook records. The expenditures were described as Entertainment ($1,850), Meals ($48), Neiman Marcus ($9,629), and Sam's Club ($11,060), for a collective total of $22,587. Due to the descriptions, Murff classified the expenditures as being attributable to girlfriend expenses.
Rick did not explain the first two expenditures, but he claimed that he went to Neiman Marcus to purchase jewelry for Dora's birthday. As for the fourth expenditure, Mendez testified that she went to Sam's Club to purchase cleaning and office supplies for the clinics.
*433 The trial court was not required to credit these explanations, but because these sums are not critical to our analysis, we will assume that the trial court did not include them in its calculation of fraud.
9. Outside Investments
In the ninth category of fraud, Murff examined Quickbook records and found that business funds were used to purchase six different investments. The investments were listed as Energy Net ($45,325), ING Direct Investments ($252), Investor's Independent Trust ($70,161), Sharebuilder ($744), BNF Eckard Global Direct ($12,750), and Officer Life Insurance ($145,643).
At the time of her report, Murff considered all of these investments to be fraudulent because Rick had not disclosed them on his inventory of assets. But at the time of trial, Murff acknowledged that Rick had since listed the Sharebuilder asset in a revised inventory.
As for the other five assets, Rick testified that Energy Net was a website that he used to purchase oil and gas interests for one of his investment companies. He testified that ING Direct Investments was a brokerage account that he used to purchase stocks. He testified that Investor's Independent Trust was a brokerage house that he used to purchase tax credits. He testified that BNF Eckard Global Direct was used to purchase additional oil and gas interests. And he testified that Officer Life Insurance was "probably" renamed as a different policy that was listed on his inventory of assets.
Rick offered no corroborating proof to explain these outside investments. As we have mentioned before, the trial court was not required to credit his bare testimony.
The sum of all six investments is $274,874. Because the Sharebuilder asset was specifically awarded to Rick in the final decree of divorce, its cost of $744 can be subtracted from this sum. That still leaves a balance of $274,130. The evidence is legally and factually sufficient to support a finding that Rick committed a fraud on the community in that amount.
10. Extramarital Entertainment
In the tenth category of fraud, Murff relied on testimony from Rick's deposition, in which he stated that he spent between $32,000 and $50,000 each year on entertainment with his paramours. Applying the more conservative amount to a seven-and-a-half-year period between 2009 and 2016, Murff opined that Rick committed a fraud on the community in the amount of $240,000.
Rick testified at trial that his deposition testimony was not "close to reality," but he offered no evidence of his actual expenditures. Nor did Rick establish that any of these expenditures were fair.
The evidence is legally and factually sufficient to support a finding that Rick committed a fraud on the community in the amount of $240,000.
11. Investment Checks
In the final category of fraud, Murff analyzed bank statements and found that investment checks totaling $15,276 were sent to Dora in her name, but they were endorsed and deposited by Rick, who then withdrew the funds and moved them to an unknown location. Murff testified that Dora learned of Rick's endorsements after she received a letter reporting that the checks had been lost following a recent bank robbery. Because Murff could not account for Rick's disposition of these funds, she determined that Rick used them to commit a fraud on the community.
Rick provided no explanation for these funds. The trial court could have reasonably *434 included this amount in its calculation of fraud.
Based on the foregoing, the evidence is legally and factually sufficient to support a finding that Rick committed a fraud on the community in the aggregate amount of nearly $4.2 million.[4] The trial court's actual finding of $3,911,805 is within that range of evidence and not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.
B. The trial court's division of the community estate is not manifestly unjust and unfair.
Rick contends that the trial court's division fails to consider several factors that weigh in favor of him receiving a larger share of the community estate. These factors include evidence that: (1) he was the family's sole source of income when Dora was in medical school; (2) his managed funds were used to acquire the couple's real estate and to pay for their children's education; (3) Dora "essentially forgave" him for his physical and emotional abuse when she abandoned her earlier divorce action; (4) his businesses suffered financially under the Affordable Care Act, whereas Dora's did not; (5) his savviness for investing greatly benefitted the community estate; and (6) Dora was awarded all of the couple's real estate holdings in Houston, where he also lives.
The trial court heard other evidence that would support a disproportionate division in favor of Dora. This evidence included testimony that: (1) Dora worked seven days per week after graduating from medical school, sometimes moonlighting in clinics, just to eliminate the couple's debt; (2) her income was much greater than Rick's; (3) her savings were also used to acquire the couple's real estate; (4) she focused on putting money into conservative retirement accounts, whereas Rick opted for riskier investments; and (5) she wanted all of the Houston real estate because the properties were in close proximity to one another and she did not want Rick living in the same neighborhood.
Based on all of these factors, and the extent of Rick's fraud on the community, we cannot say that Rick has overcome the presumption that the trial court properly exercised its discretion in its division of the community estate. See Murff , 615 S.W.2d at 699 ; Logsdon v. Logsdon , No. 02-14-00045-CV, 2015 WL 7690034, at *9-10 (Tex. App.-Fort Worth Nov. 25, 2015) (mem. op.) (upholding a disproportionate division of the community estate-57.6% to the husband and 42.4% to the wife-where the trial court found that the wife had committed a fraud on the community). Under the applicable standard of review, we conclude that (1) the trial court had sufficient information upon which to exercise its discretion, and (2) the trial court did not divide the community estate in a manner that is manifestly unjust and unfair. See Willis , 533 S.W.3d at 551.
RELIABILITY
In his second issue, Rick argues that Murff's expert opinion is unreliable-and therefore, not evidence-because it "contains too many analytical gaps and too often relies upon faulty methodologies." We address this issue in two parts.
First, Rick's complaint about analytical gaps is both cursory and conclusory. Rick does not identify which of Murff's analyses are problematic, nor does he *435 identify the gaps, if any, that are present in those analyses. We could not address this complaint without making arguments on Rick's behalf, a role the court as neutral arbiter does not undertake. Also, to whatever extent this complaint overlaps with Rick's first issue, we have already addressed any gaps in the evidence. We overrule any further complaint about gaps in the evidence as inadequately briefed. See Tex. R. App. P. 38.1(i).
Second, as for Rick's complaint about faulty methodologies, which appears to be the primary focus of this issue, Rick never objected to Murff's methodologies when she took the stand and testified. Also, when Dora offered Murff's report into evidence, Rick agreed to its admission without objection, effectively waiving the complaints he now raises on appeal. We conclude that Rick's complaint was not preserved for appellate review. See City of San Antonio v. Pollock , 284 S.W.3d 809, 817 (Tex. 2009) ("We therefore conclude that when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the court has the opportunity to conduct this analysis.").[5]
ADDITIONAL FINDINGS OF FACT
After the trial court signed its findings of fact and conclusions of law, Rick timely requested that the trial court make an additional set of findings. Some of the requests addressed the trial court's spoliation finding, but the vast majority of the requests addressed the trial court's calculation of fraud. Rick sought more particularity as to how the trial court arrived at its calculation, and he requested findings for each of the eleven categories of fraud that were identified in Murff's report. All of these requests were overruled by operation of law.
Now in his third issue, Rick complains about the trial court's failure to make additional findings, specifically with regard to the calculation of fraud. We conclude that the trial court was not required to make Rick's requested findings because they merely addressed evidentiary issues that were unnecessary to the judgment. See Nicholas v. Envtl. Sys. (Int'l) Ltd. , 499 S.W.3d 888, 894-95 (Tex. App.-Houston [14th Dist.] 2016, pet. denied) ("The trial court is not required to set out in detail every reason or theory by which it arrived at its final conclusions. Nor is the trial court required to accept amended findings and conclusions that merely resolve evidentiary issues or are otherwise unnecessary.").
Furthermore, we note that the absence of additional findings did not prevent Rick from challenging on appeal every component of the trial court's finding of fraud, which, as we explained above, is supported by both legally and factually sufficient evidence. Therefore, to whatever extent that the trial court erred by not making additional findings, Rick cannot show that he suffered any injury. See Tenery v. Tenery , 932 S.W.2d 29, 30 (Tex. 1996) (per curiam) (upholding a disproportionate division of the community estate in the absence of findings where the record contained ample evidence in support of the judgment).
CONCLUSION
The trial court's judgment is affirmed.

Murff rounded the figures in her report to the nearest dollar, which explains why some calculations may appear on their face to be off by a de minimis amount.

$2,322,955 + $375,280 = $2,698,235.

(750 patients per month - 300 patients per month) × $89.54 per patient × 13 months = $523,809.

$2,698,235 (pharmacies) + $531,117 (clinics) + $2,188 (credit cards) + $59,194 (cash gifts) + $379,160 (unaccounted for withdrawals) + $274,130 (outside investments) + $240,000 (extramarital entertainment) + $15,276 (investment checks) = $4,199,300.

Rick also alludes in his brief that Murff may not have been qualified to testify as an expert. To whatever extent a qualification complaint is included in Rick's reliability issue, it was not preserved because Rick did not object to Murff's qualifications. See Nissan Motor Co. v. Armstrong , 145 S.W.3d 131, 143-44 (Tex. 2004).