

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ROSS GENTRY CLARKE, | § | No. 08-23-00016-CV |
| Appellant, | § | Appeal from |
| v. | § | 73rd Judicial District Court |
| REXANN PASSMORE CLARKE, | § | of Bexar County, Texas |
| Appellee. | § | (TC# 2019-CI-07923) |

## **MEMORANDUM OPINION**

In this divorce case, Roy Gentry Clarke appeals the trial court's finding that he committed fraud against the community estate. He also challenges the trial court's division of the community estate.[1] The trial court reconstituted the community estate by adding six distinct monetary awards based on the alleged fraud. It also divided the community estate based on an unequal percentage to reach a fair and equitable division. Five of the awards used to reconstitute the community estate were exclusively based on an expert's testimony. Because the expert concluded that two of the five awards were accounted for elsewhere—and should not be included as fraud damages to avoid double-counting—we find that the trial court abused its discretion in using those two awards in calculating the reconstituted community estate. We reverse the judgment to delete those two awards, and remand for a division of property consistent with this opinion.

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent they might conflict with our own. *See* TEX. R. APP. P. 41.3.

**BACKGROUND**

Roy and Rexann married in September 2002. The couple had no children together. Rexann filed for divorce in April 2019. As the issues in this divorce are limited to the division of property, we limit our recital of facts to that issue.

The couple lived in a home that Roy purchased before their marriage. Roy is 22 years older than Rexann, and four years into their marriage, Roy began collecting Social Security benefits, which he put towards the monthly mortgage payments. Roy paid the mortgage on the home, as well as routine maintenance bills, utilities, and HOA dues. Rexann paid for home insurance, health insurance, and housekeeping expenses. Rexann also paid for some renovations on the house and vacations that the couple took together.

Roy owns a window replacement business. Throughout their marriage Rexann worked various jobs, including uncompensated time helping Roy with his business. Later, she worked at USAA where her salary rose to $96,000 by the time of the divorce. While at USAA, Rexann also earned her MBA. Though USAA paid for her tuition, Rexann incurred about $35,000 in student loans from her undergraduate education before she and Roy married. Roy was in charge of making Rexann's student loan payments. But according to Rexann, he made only "a handful" of student loan payments, such that the balance rose from approximately $35,000 to nearly $100,000 at the time of their divorce. Roy largely managed the couple's finances, and Rexann testified she did not understand the extent of the couple's assets or debt.

In 2013, Roy asked Rexann to borrow money from her retirement account to pay off tax debt on the home. Rexann ultimately agreed and withdrew $22,000 from her retirement account based on Roy's promise to deed her an interest in the separate-property-house. Roy then executed a special warranty gift deed, which Rexann believed made the home community property. Rexann later took out a $35,000 loan to pay off additional debts in 2018, including debt on two of Roy's

2

business credit cards, one of Roy's personal credit cards, and one of her personal credit cards which she alleged Roy used for business supplies without her consent.

Rexann filed for divorce on insupportability and cruelty grounds. She also sought recovery for equitable reimbursement and asserted fraud claims. In the divorce proceedings, Roy moved for partial summary judgment to declare the home as his separate property despite the special warranty gift deed. The motion claimed that because the deed lacked the requisite statutory language to convert separate property to community property under the Family Code, it remained his separate property. Roy also contended he did not receive a fair and reasonable disclosure of the legal effect of converting his separate property to community property before he executed the deed. The trial court granted Roy's motion and voided the deed. Therefore, the house remained Roy's separate property by the time of the divorce.

The case proceeded to a four-day bench trial. Rexann elicited testimony from her expert forensic accountant, Michael Turner. Turner completed an analysis based on the document discovery in the case, including bank statements, business records, loan documents, liens, and tax records. From those records, Turner identified several "badges of fraud." A badge of fraud is an instance of suspected nefarious behavior. If enough badges are identified, a forensic accountant can conclude that a party engaged in intentional fraudulent conduct. Turner testified that fraud is often evident only from circumstantial evidence showing a pattern of suspicious conduct.

In this case, Turner identified several badges of fraud in Roy's window replacement business. The first was a failure to keep records to document transactions, such as invoices, customer orders, documentation for the cost of goods sold, and labor costs. Next, Turner concluded that Roy understated his income based on a comparison of what bank statements showed, and what personal income tax and K-1 records showed. Turner also noted that Roy's business kept inadequate books and records failed to pay estimated taxes and yearly taxes on time.

Turner did not have all of Roy's business records—only what Roy produced. To document an amount for the claimed fraud, Turner recreated a set of books for sales, revenues, and the cost of goods for 2012 to 2019. Though Roy's business on paper showed a $10,000 cumulative loss from 2012 through 2018, Turner determined the business earned $1,233,000 in gross revenue during that time frame. Assuming an industry-standard 30%–40% gross margin, Turner concluded that Roy's business should have returned a $400,000 to $450,000 gross profit during that period.[2] Turner bolstered that conclusion with what Roy's business returned before 2012 and what it generated after Roy and Rexann separated. Roy's business showed between $50,000 to $54,000 of taxable income from 2010 and 2011 (evidencing a 33.7% profit margin), but then essentially showed no income from 2012 through 2019.[3] Turner also found in the eleven months just before trial (and after the couple had separated), Roy's business generated approximately $313,000 in revenue with $116,000 gross margin, which tracked his prediction for industry norms.

Turner testified he at first could not account for $393,338.22 in funds generated from the business which he found indicative of concealing assets or debt. This sum was detailed in a spreadsheet admitted at trial that set out seven categories of "Funds Unaccounted for/Waste":

| | |
|---|---|
| Cash Withdrawals | $74,746.79 |
| Payments to SACU/Credit Human | $89,766.02 |
| Stores (personal) | $40,287.79 |
| Credit Card Payments | $30,293.02 |
| Miscellaneous | $66,035.15 |
| Payments to Broadway Bank | $44,152.49 |
| Misc/other unknown | $48,056.96 |
| Total | $393,338.22 |

---

[2] Rexann was unaware the business generated that much money, as Roy had always told her the business was struggling and made only about $20,000 per year.

[3] Turner's testimony at times uses the terms "gross profit," "profit margin," "gross margin," and "gross profit margin." No issue is raised here as to whether these terms mean different things, or how they might relate to net profit, or what the proper legal measure for estimated profits would be in a case like this.

As we explain below, Turner later reduced this total amount to $259,419.71 after learning that two of the seven items that he once believed were unaccounted for ($89,766.02 and $44,152.49) were used to pay the home mortgage and loan payments for Rexann's vehicle. So the funds were accounted for elsewhere in the assets available for division by the trial court.

Turner also testified to Rexann's equitable reimbursement claims. He stated that his analysis showed that $202,216.73 of community funds were paid toward the mortgage for Roy's separate property home, $102,909.84 of community funds were used for property taxes and home improvements on the separate-property-house, and $53,550.62 of community funds were used to keep Roy's businesses in operation. Roy did not offer his own expert witness.

Following the bench trial, the trial court rendered a judgment divorcing the parties on no-fault grounds and confirmed the home as Roy's separate property. It also agreed with Rexann's fraudulent inducement claim over her withdrawal of $22,000 from her retirement account to pay the tax debt on the home and awarded all other tax debt to Roy. After dispersing the couple's personal property, the court took the remaining issues, including the fraud and waste claims, under advisement. Later, the trial court issued a memorandum of ruling, which does not appear in the appellate record.

In September 2022, the court entered the final divorce decree, which, among other things, awarded each party their respective personal effects, cash and bank accounts, brokerage accounts, life insurance policies, vehicles, and home furnishings. It also awarded Rexann her retirement accounts[4] and Roy his home-renovation business. As for debts, the trial court ordered each party to pay their own credit card and post-separation debts. The court also assigned to Rexann the balance due on her vehicle loan and to Roy the mortgage on his home. It ordered Roy to pay all

---

[4] The only reference to a retirement account in the record is Rexann's USAA retirement account, which she stated had a balance of $280,363 as of trial (not accounting for unpaid loans).

unpaid federal income tax liabilities of the parties from the beginning of their marriage through December 31, 2021, as well as any penalties or interest due on those taxes.

The trial court then determined the community estate was entitled to a judgment based on Roy's fraud committed against the community estate based on:

1) fraudulent inducement for the $22,000 withdrawal from Rexann's retirement account to pay taxes on Roy's separate property home;

2) $74,746.79 in fraudulent cash withdrawals from Roy's separate property business account;

3) $66,035.15 in fraudulent miscellaneous expenditures paid by Roy from his separate property business account;

4) $48,056.96 in fraudulent "other expenses" paid by Roy from his separate property business account;

5) $89,766.02 in fraudulent expenditures paid by Roy to SACU/Credit Union from his separate property business account; and

6) $44,152.49 in fraudulent expenditures paid by Roy to Broadway Bank from his separate property business account.

The court then awarded Rexann a $213,579.45 judgment against Roy, which it stated represented 60% of the cumulative judgment of fraudulent claims, plus $6,750, which is the remaining balance due on Rexann's $35,000 loan from 2018.[5]

Both Roy and Rexann appealed the judgment, but Rexann voluntarily dismissed her appeal. Roy presents two broad issues in this appeal: 1) whether the trial court abused its discretion in finding Roy committed fraud, and 2) whether the trial court abused its discretion in dividing the community estate.

## STANDARD OF REVIEW

A trial court abuses its discretion when it "acts arbitrarily, unreasonably, without regard to guiding legal principles, or without supporting evidence." *Howe v. Howe*, 551 S.W.3d 236, 250

---

[5] This appears to be a minor mathematical error. Sixty percent of the total fraud damages plus $6,750 is $213,604.45.

6

(Tex. App.—El Paso 2018, no pet.) (citing *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)). "Because in family law cases the abuse of discretion standard of review overlaps with the traditional sufficiency standards of review, legal and factual insufficiency are not independent grounds of reversible error; instead they constitute factors relevant to our assessment of whether the trial court abused its discretion." *Garza v. Garza*, 217 S.W.3d 538, 549 (Tex. App.—San Antonio 2006, no pet.). Thus, in considering whether the trial court abused its discretion, we first ask whether the trial court had sufficient evidence on which to exercise its discretion, then determine whether the trial court erred in its application of that discretion. *Id.*

Roy requested findings of fact and conclusions of law from the trial court, but none were made, and Roy does not assert that as a separate issue on appeal. Because the court did not make findings of fact and conclusions of law, all findings necessary for the judgment are implied so long as those findings are supported by sufficient evidence in the record. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Evidence is legally insufficient if there is no more than a scintilla of evidence to support a finding. *Enriquez v. Krueck*, 887 S.W.2d 497, 499 (Tex. App.—San Antonio 1994, no writ) (citing *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex. 1987)). Evidence is factually insufficient if, after consideration of all the evidence, the finding is so against the great weight and preponderance of the evidence "as to be clearly wrong and manifestly unjust." *Id.*

## FINDINGS OF FRAUD

The trial court entered judgments for two types of fraud: fraudulent inducement and fraud on the community. Roy challenges both.

### A.   Fraudulent inducement

Fraudulent inducement is a "species of common-law fraud." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). To recover for fraudulent inducement, a plaintiff must show that the

defendant made a promise of future performance with no intention of performing, and that the promise induced her to enter a contract to her detriment. *Id.*

Rexann claimed that Roy fraudulently induced her to take out a $22,000 loan by promising to give her half of the interest in the home. She testified that she believed the home would be community property, and she would not have withdrawn the money if she knew that would not be the case. The evidence also supports an inference that Roy did not intend to keep his promise. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made."). Roy signed the deed for the property which recites that it was "intended to convert [Roy]'s separate property to community property" and signed a Survivorship Agreement regarding the real property stating, "Spouses aver that they own the Property jointly as community property[.]" Yet he later claimed that he did not understand what he signed in support of his request that the deed be found void. He also prevailed upon the trial court to void the deed because it did not include the correct statutory language for converting separate property to community property. The inference from Roy's contradictory positions provides more than a scintilla of evidence that he did not intend to keep his promise and is therefore legally sufficient to support a fraudulent inducement judgment.

Roy focuses his challenge on the reliance element for fraudulent inducement. He argues Rexann most likely did not rely on his promise. Instead, she applied for the hardship withdrawal the same day the couple received notice of the tax delinquency. And she withdrew the money from her retirement five months before Roy signed the special warranty deed. First, the evidence to which Roy cites to is found in a summary judgment pleading and not the evidence from the final divorce hearing; it is therefore not relevant to this appeal. "In order to be considered on an appeal from a trial on the merits, summary judgment evidence must have been introduced and admitted

8

during the trial on the merits." *Paselk v. Rabun*, 293 S.W.3d 600, 612 (Tex. App.—Texarkana 2009, pet. denied). Second, even if that evidence were properly before the trial court, the timeline of events does not necessarily negate reliance. The trial court was entitled to believe Rexann's testimony that she relied on Roy's promise. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (the court of appeals must give "due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

The trial court's fraudulent inducement judgment is not so against the great weight and preponderance of evidence to be clearly wrong, and that finding is not an abuse of discretion. We overrule Roy's issue on fraudulent inducement.

## B. Fraud on the community

A fiduciary relationship exists between spouses, who are bound by that duty in dealing with the community estate. *Connell v. Connell*, 889 S.W.2d 534, 541 (Tex. App.—San Antonio 1994, writ denied). "'Fraud on the community' is a judicially created concept based on the theory of constructive fraud and is applied when there is a breach of a legal or equitable duty, which violates this fiduciary relationship existing between spouses." *Greco v. Greco*, No. 04-07-00748-CV, 2008 WL 4056328, at *5 (Tex. App.—San Antonio Aug. 29, 2008, no pet.) (mem. op.) (citing *Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no writ.) (op. on reh'g)). "While waste claims often are premised on specific transfers or gifts of community property to a third party, a waste judgment can be sustained by evidence of community funds unaccounted for by the spouse in control of those funds." *Puntarelli v. Peterson*, 405 S.W.3d 131, 139 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see also Wheeling v. Wheeling*, 546 S.W.3d 216, 225 (Tex. App.—El Paso 2017, no pet.) (collecting cases).

Section 7.009 of the Family Code provides a statutory remedy for fraud on the community TEX. FAM. CODE ANN. § 7.009. Once the court determines one spouse committed fraud on the community, it must determine the amount by which the community estate was depleted due to the fraud and the amount of the reconstituted estate—that is, the total value of the community estate that would have existed but for the fraud. *Id.* § 7.009(a), (b). The court then must divide the value of the reconstituted estate in a manner it deems just and right. To do so, the court may award a disproportionate share of the remaining community assets to the wronged spouse, or may award a money judgment to the wronged spouse against the spouse who committed fraud, or a combination of both. *Id.* § 7.009(c).

The trial court found that Roy committed fraud on the community. Roy contends the trial court abused its discretion in entering a judgment for fraud on the community for several reasons: 1) Rexann's expert witness testimony was unreliable; 2) the expert's testimony was conclusory; 3) there was no presumption of fraud; and 4) if there was a presumption, it was rebutted for each of the specific categories of fraud that Rexann alleges. We discuss each of these arguments in turn.

**(1) Reliability**

As noted above, Turner testified to and quantified seven categories of fraud on the community from Roy's business. The trial court incorporated five of those into its judgment. On appeal, Roy contends that Turner's analysis is based on an unreliable foundation and methodology. Before trial, Roy moved to exclude Turner's testimony; but no ruling on that motion appears in our record, and Roy did not object to Turner's testimony at trial. To the contrary, when Rexann offered Turner as an expert witness Roy's attorney stated, "I'm not objecting to him testifying as an expert."

This state of the record offers an insurmountable hurdle to Roy's reliability-based arguments. As Rexann points out, a party waives a challenge to the reliability of an expert's

opinion when there is no objection to the methodology in the trial court. TEX. R. APP. P. 33.1; *see Coastal Transp. Co., v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) ("[W]hen a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis."). For reliability challenges [a]n objection is required to give the proponent a fair opportunity to cure any deficit and thus prevent trial by ambush." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009). Rexann was never given that opportunity here.

Roy contends that he "asserted the basis of Turner's opinion was meritless" in his opening argument and cross-examined Turner over his methodology, the facts he assumed, and data he relied on. But cross-examination, even ardently done, does not substitute for an objection or motion to strike.

### (2) Conclusory opinion

Even though Roy failed to object to Turner's methodology, he may still challenge Turner's opinion as conclusory. *Coastal Transp.*, 136 S.W.3d at 233. A fact finding cannot be supported by conclusory or speculative expert testimony, even when not objected to. *Pollock*, 284 S.W.3d at 816. As the Texas Supreme Court has recently explained:

> Conclusory testimony is considered no evidence. An expert's testimony is conclusory when the expert asserts a conclusion with no basis; when the basis offered provides no support for the opinion; or when the expert offers only his word that the bases offered to support his opinion actually exist or support his opinion. An expert must link his conclusions to the facts and explain[] the basis of his assertions. Asking the jury to take the expert's word for it because of his status as an expert will not suffice.

*Schindler Elevator Corp. v. Ceasar*, 670 S.W.3d 577, 585 (Tex. 2023) (internal quotation marks and footnotes omitted). By example, in *Coastal,* an expert's bare opinion that the defendant acted

11

with conscious indifference was simply an assertion with no basis and could not support the judgment. *Coastal Transp.*, 136 S.W.3d at 233. But on our record, we conclude that Turner testified to the basis for his opinion.

In forming his opinion, Turner reviewed pleadings, discovery, documents provided by the parties, bank statements, real estate documents, loan agreements, liens, and tax records. Looking at the entire record, Turner evaluated the records for indicia of suspicious behavior that are termed "badges of fraud." *See Tidwell v. Roberson*, No. 14-16-00170-CV, 2017 WL 3612043, at *3 (Tex. App.—Houston [14th Dist.] Aug. 22, 2017, pet. denied) (mem. op.) ("Although the presence of an individual badge of fraud is not conclusive, the presence of several badges of fraud may support an inference of fraudulent intent.") (citing *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566–67 (Tex. 2016)); TEX. BUS. & COM. CODE ANN. § 24.005(b) (listing factors relevant to determining "actual intent" in fraudulent transfer claims). Turner testified that he found several badges of fraud, including understatement of income, keeping inadequate books and records, failure to pay estimated taxes and yearly tax amounts on time, and implausible explanations of behavior. Turner then quantified the degree of fraud by reviewing all of the records for unaccounted-for funds and expenses. He also extrapolated Roy's expected income from prior business records and business norms. He could confirm Roy's gross profit margin was within the expected range for his industry for two years while the parties were married, and again shortly before trial, leading to his conclusion that his claims of no or extremely low income for the intervening period were fraudulent.

Because Turner testified as to the basis for his opinion, it was not conclusory and we overrule this issue.

### (3) Presumption of fraud

"A presumption of 'constructive fraud,' i.e., waste, arises when one spouse disposes of the other spouse's interest in community property without the other's knowledge or consent." *Puntarelli*, 405 S.W.3d at 137–38. No proof of intent to deceive is required. *Id.* at 138. Roy argues that Turner incorrectly stated in a footnote to his analysis that a presumption of fraud arises when a spouse pleads constructive fraud. We agree that this is an incorrect statement of the law. A spouse must do more than plead constructive fraud. That said, we do not agree that this caused an error in the trial court's judgment. Nothing suggests that the trial court relied on Turner's misstatement of the law. The trial court could have simply relied on Turner's description of the badges of fraud from the understatement of income, failure to keep adequate books and records, failure to pay taxes on time, and the implausible explanations of that behavior. The record also contains evidence supporting the implied finding that Rexann did not know of or consent to Roy's disposition of community funds. She testified that she was "quite shocked" and "flabbergasted" at how much money the business earned, that she did not know where the money went, and that it was not spent with her knowledge, consent, or approval. This evidence was sufficient to create the presumption of constructive fraud.

### (4) Rebuttal of presumption of fraud

For the most part, Roy frames his argument as a legal sufficiency argument, arguing that each of the categories of fraud found by the court was not supported by legally sufficient evidence. But, the "effect [of a presumption] is to shift the burden of producing evidence to the party against whom it operates." *Gen. Motors Corp. v. Saenz on Behalf of Saenz*, 873 S.W.2d 353, 359 (Tex. 1993); *In Interest of Rodriguez*, 940 S.W.2d 265, 271 (Tex. App.—San Antonio 1997, no writ). Only after evidence contradicting the presumption is produced does the presumption disappear and place the burden of proof once again on the petitioner. *Id.* Once the presumption of

constructive fraud arises, "[t]he disposing spouse then bears the burden of proof to show fairness in disposing of community assets." *Greco*, 2008 WL 4056328, at \*5; *Wheeling*, 546 S.W.3d at 225. Therefore, at the outset, Roy must have first rebutted the presumption before Rexann needed to produce legally sufficient evidence supporting her claims.

Turner categorized the unaccounted-for funds into seven categories. The trial court entered a judgment for fraud for five of those categories: (1) cash withdrawals ($74,746.79), (2) fraudulent miscellaneous expenditures paid by Respondent from Respondent's separate property business account ($66,035.15), (3) fraudulent "other expenses" paid by Respondent from Respondent's separate property business account ($48,056.96)[6], (4) payments to SACU/Credit Human ($89,766.02), and (5) payments to Broadway Bank ($44,152.49).

During trial, most of Roy's testimony related to use of funds generally. He testified that he paid with credit card for some of the out-of-town trips that he and Rexann took and that "some of the time" he used his debit card to pay for dinners with Rexann and to buy her gifts at department stores. But, he did not quantify these expenditures and provided no documents to corroborate his explanations. Further, these payments likely fit into the two categories that Turner included in his analysis but for which the trial court did not grant a judgment: stores and credit card payments. Given the testimony from Roy, Rexann, and Turner, and the fact that the trial court could assess the witnesses' credibility and demeanor, the trial court acted within its discretion to believe Turner and Rexann's testimony over Roy's and conclude Roy did not rebut the presumption of constructive fraud. *See Cantu v. Cantu*, 556 S.W.3d 420, 428 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

---

[6] Turner explained that one miscellaneous category was an accounting adjustment after normal operating expenses and the other was for any funds that did not fit into other categories.

14

Roy offered an explanation about two checks that he wrote to his niece totaling $11,300. He testified that these checks paid off a cash loan given to him by his niece to pay for an attorney. Roy did not produce evidence of the loan or subsequent payment to his attorney or explain why he needed the loan to begin with. The trial court was within its discretion to disbelieve Roy's explanation of the disposition of $11,300 to his niece. So Roy did not rebut the presumption of fraud for this disposition.

Roy also testified about the transfers from his Broadway Account to SACU/Credit Human totaling $89,766.02. He explained that he used the Credit Human account to pay the mortgage, a $200 monthly payment to the IRS for a joint tax debt, and a $150 monthly credit card payment. Because his Social Security payments that were deposited into that account were not sufficient to cover those bills, Roy stated that he would transfer money from the Broadway Bank Account. Rexann testified that she was aware of and in agreement with the transfers from the business account to the Credit Human account. Once Rexann testified that she had knowledge of and consented to these transfers, the presumption of fraud disappeared. Turner also testified that although he first included the $89,766.02 as unaccounted for funds, he *deducted* that amount from his estimate of fraud after learning that the transfers were for mortgage payments. Yet the trial court's judgment includes the $89,766.02. Because there was neither a presumption of fraud nor any evidence that the payments from the Broadway account to the Credit Human account were fraudulent, the trial court abused its discretion in entering a judgment for fraud for those transfers. We sustain Roy's legal sufficiency challenge to that portion of the judgment for $89,766.02.

Roy also challenges the trial court's judgment for $44,152.49 for fraudulent payments made to Broadway Bank. Roy testified that the payments were used to pay a loan on Rexann's vehicle. This testimony rebuts the presumption of fraud. After learning about the purpose of the payments, Turner also removed these payments from the amount that he initially believed were

15

unaccounted for and fraudulent. Yet this sum also found its way into the judgment. After Turner changed his opinion about the fraudulent nature of these payments, no evidence supported a finding of fraud. It was therefore an abuse of discretion for the court to enter a judgment for fraud for those transfers. We sustain Roy's legal sufficiency challenge to that portion of the judgment for $44,152.49.

Roy also argues that he rebutted the presumption that cash withdrawals in the amount of $74,746.79 were fraudulent because the amounts of the cash withdrawals were nominal, pointing to eight small withdrawals totaling $1,023 over a seven-year period. He culls the evidence of these withdrawals from the Account Register entered into evidence. While he makes this argument on appeal, at trial Roy never discussed these individual withdrawals and the court was not required to review the more than 800 pages of exhibits to find such evidence on his behalf. *Aguilar v. Morales*, 162 S.W.3d 825, 838 (Tex. App.—El Paso 2005, pet. denied) ("[N]either trial court nor appellate court were required to sift through voluminous deposition transcripts in search of evidence to support contentions[.]").

Similarly, Roy argues that specific payments categorized as miscellaneous payments appear to have been made to Rexann and were not fraudulent.[7] He also argues that some expenses appear to be for accounting because the code used for one of the miscellaneous categories has the notation "ask my accountant." Finally, he argues that since one of the amounts is a deposit instead of a withdrawal, it cannot be constructive fraud. At trial, Roy did not testify about these payments, did not question Rexann or Turner about them, and did not direct the trial court to any evidence of them in the exhibits. Again, as with the cash withdrawals, the trial court was not required to go

---

[7] It is not clear from the account register whether these payments were made to Rexann, or whether Turner may have only believed they might have been made to her. For some of these payments, the explanation Turner entered in the account register is "Rexann Clarke (RG Clarke?)."

through voluminous exhibits without guidance to determine whether Roy rebutted the presumption of fraud.

### (5) Disposition of the appeal

In conclusion, we affirm three of the trial court's judgments for fraud but reverse on legal sufficiency grounds two specific awards used in the reconstituted estate. Although we reverse two of the five distinct categories for fraud against the community, we cannot simply reform the divorce decree and remove those amounts from the judgment. "[O]nce reversible error affecting the 'just and right' division of the community estate is found, the court of appeals must remand the entire community estate for a new division" *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985). Judgments for fraud on the community are part of a court's property division. "[W]aste, fraudulent transfer, or other damage to community property are claims belonging to the community itself, so they must be included in the trial court's just-and-right division of community property upon divorce." *Chu v. Hong*, 249 S.W.3d 441, 444–45 (Tex. 2008).

A court may enter a money judgment for fraud on the community, but as the Texas Supreme Court explained:

> [T]hat type of personal judgment is merely a means for recouping the defrauded spouse's share of the community property lost as a result of the wrongdoing spouse's breach of the trust relationship. Such a recovery is not awarded as "separate damages" for an independent cause of action.

*Schlueter v. Schlueter*, 975 S.W.2d 584, 588–89 (Tex. 1998), (quoting *In re Marriage of Moore*, 890 S.W.2d 821, 828 (Tex. App.—Amarillo 1994, no writ)). The enactment of § 7.009 of the Texas Family Code codified the courts' ability to grant money judgments, alone or with any other "legal or equitable relief," for fraud on the community, but the purpose of these judgments remains a just and right division of the community estate. TEX. FAM. CODE ANN. § 7.009(c).

So because money judgments like the ones entered here are to ensure a proper division and because they may be combined with other remedies, when a trial court makes erroneous rulings

17

on a claim of fraud on the community, the entire division of property may be affected and must be remanded. Even when the reversible claims "could be identified in the trial court's property division, the court of appeals could not simply modify the decree by striking the reimbursement awards 'because to do so would be to make a new division of the estate of the parties, a matter within the discretion of the trial court.'" *Jacobs*, 687 S.W.2d at 733, (quoting *Faulkner v. Faulkner*, 582 S.W.2d 639, 642 (Tex. App.—Dallas 1979, no writ)).

For example, in *Geisler v. Geisler*, the trial court found that the husband wasted community assets and awarded the wife a $99,000 money judgment as compensation.[8] No. 03-08-00734-CV, 2010 WL 2330362, at *3 (Tex. App.—Austin June 10, 2010, no pet.) (mem. op.). The Austin court of appeals reversed the finding of waste. *Id.* at *4. But rather than reform the decree to remove the money judgment, the court held that they needed to "reverse and remand the entire property division for reconsideration." *Id*. at *4; *see also Zieba*, 928 S.W.2d at 791–92 (after holding that it was error for the trial court to deny wife's claim of fraud on the community, the court remanded for a redivision of community property); *Winkle v. Winkle*, 951 S.W.2d 80, 91 (Tex. App.—Corpus Christi 1997, writ denied) (because an order for indemnification "could have influenced the general scheme of the trial court in dividing community assets," the case was remanded for a new division of the community estate).

The trial court's judgment awarding Rexann 60% of the damages for fraud on the community may have affected the overall division of the property. For example, as assumed by Roy in his briefing, rather than reimbursement the trial court may have granted fraud damages for

---

[8] Waste, like fraud on the community, involves actions of one spouse that deprive the community estate of assets. *Giesler v. Giesler*, No. 03-08-00734-CV, 2010 WL 2330362, at *3 (Tex. App.—Austin June 10, 2010, no pet.) (mem. op.).

the transfers to Credit Human that were used for mortgage payments.[9] Indeed, had the court awarded both reimbursement and fraud damages in relation to the mortgage payments, it would have resulted in a double recovery to Rexann. Although we decide today that Roy's acts in transferring money to the Credit Human Account and making loan payments to Broadway Bank were not fraud on the community, it is for the trial court to decide how those sums, accounted for elsewhere, affect the division of the property. If we reform the decree to only remove the fraud damages, we would be implicitly denying any other available relief and making our own division of the property, which we have no right to do. *McKnight v. McKnight*, 543 S.W.2d 863, 866 (Tex. 1976).

## IMPROPER DIVISION OF THE COMMUNITY ESTATE

Roy's second issue claims that the trial court's division of the community estate was an abuse of discretion. Specifically, he contends that because Rexann only requested 50% of the estate if the divorce was granted on no-fault grounds, the trial court was prohibited from granting her 60% of the judgments for fraud. He also argues that the division is grossly disproportionate because, if the fraud judgments are reversed, the division amounts to an 82/18 split in favor of Rexann. Because our reversal of two judgments for fraud requires us to remand for the trial court to make a new just and right division, we need not reach Roy's second issue. TEX. R. APP. P. 47.1 (allowing intermediate appellate courts to limit their discussion of the issues to those necessary to decide the appeal).

---

[9] At trial, Rexann and Turner testified that community funds were used to reduce the principal on Roy's separate property mortgage by $202,216.73, for which Rexann sought reimbursement. The trial court, however, did not order reimbursement to the community for that sum.

## CONCLUSION

We reverse the fraud findings of $89,766.02 and $44,152.49 made by the trial court. We overrule Roy's other challenges, other than we remand for the trial court to make a division of the estate consistent with our opinion.

JEFF ALLEY, Chief Justice

January 30, 2024

Before Alley, C.J., Palafox and Soto, JJ.